UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KARTHIKEYAN V. VEERA,

              Plaintiff,

v.

AMBAC FINANCIAL GROUP, INC.,
AMBAC PLAN ADMINISTRATIVE
COMMITTEE, SEAN T. LEONARD,
GREGG L. BIENSTOCK, DIANA
ADAMS, ROBERT EISMAN, TIMOTHY
STEVENS, ANNE GILL KELLY and
JANE AND JOHN DOES 1 THROUGH
10,

              Defendants.

Case No: **10 CIV 4191**

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY
ACT OF 1974**



## I.    Introduction

1.    Plaintiff Karthikeyan V. Veera, on behalf of the Ambac Financial Group, Inc. Savings Incentive Plan (the "Plan"), himself and a class of all others similarly situated, alleges the following based upon personal information as to himself and the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ambac Financial Group, Inc. ("Ambac" or the "Company"), including the Company's proxy statements (Form DEF14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Plan; a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL"); interviews with Plan participants; and a review of available documents governing the operation of the Plan.

## II.    Nature of the Action

2.    Plaintiff brings this action on behalf of the Plan and as a class action pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1109 and 1132, against the fiduciaries of the Plan, including Ambac, on behalf of participants in and beneficiaries of the Plan (collectively "Plan Participants").

3.    The Plan is a defined contribution plan sponsored by Ambac, which confers tax benefits on participating employees to incentivize saving for retirement or other long-term goals.

4.    Plaintiff and the other members of Class (defined below) were participants in the Plan during the Class Period (defined below), during which time the Plan held interests in the Company's common stock through the Ambac Stock Fund (the stock and the units in the Ambac Stock Fund are collectively referred to as "Ambac Stock").  During the Class Period Plaintiff and the other Class members held Ambac Stock in their retirement investment portfolios in the Plan.

5.    Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period from October 25, 2006 through April 23, 2009 (the "Class Period").

6.    Throughout the Class Period, Defendants, each having certain responsibilities regarding managing and investing the Plan assets, breached their fiduciary duties to Plaintiff, the Plan, and the proposed Class by failing to prudently and loyally manage the Plan's investment in Ambac Stock.  They breached their duties by: (1) continuing to offer Ambac Stock as an investment option for the Plan when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan Participants regarding the Company's financial condition and the risk of investing retirement assets in Ambac Stock and (3) maintaining the Plan's pre-existing heavy investment in Ambac Stock when it was no longer a prudent Plan investment.

- 2 -

7.     Specifically, throughout the Class Period, Defendants allowed for the imprudent investment of the Plan's assets in Ambac Stock even though:

(a)     Ambac was exposed to billions of dollars of losses on high-risk transactions;

(b)     Ambac had significantly loosened and lowered its underwriting standards which was a fundamental change in its business;

(c)     Ambac had sacrificed its financial security and stability by pursuing risky revenue growth through high-risk transactions that were failing or were in serious jeopardy of failing;

(d)     Ambac had improperly bolstered its reported financial results by overstating the value of its business and failing to properly mark-to-market Ambac's portfolio of high-risk securities, even as the market collapsed for the collateral underlying those securities;

(e)     The Company had far greater exposure to anticipated losses than it had disclosed;

(f)     The Company's stock price was artificially inflated; and

(g)     Heavy investment of Participants' retirement savings in Ambac Stock would inevitably result in significant Plan losses, and consequently losses to its participants, including Plaintiff and the Class.

8.     As a result of Defendants' breaches of fiduciary duty, the Plan and its Participants, including Plaintiff and the Class, used their retirement assets to acquire and hold Ambac Stock through the Plan at inflated prices.

9.     As the truth about Ambac's problems and massive losses was gradually disclosed to the market, the price of the Company's shares fell sharply from its high of $96.08 per share during the Class Period to its current price of approximately $1.00 per share.

10.     As a result of Defendants' fiduciary breaches, the Plan has suffered substantial losses including lost profits and millions of dollars in depleted retirement savings and anticipated retirement income.

11.     Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

12.     Plaintiff brings this action on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, Plaintiff seeks injunctive and other appropriate equitable relief from Defendants as available under applicable law, the imposition of a constructive trust, restitution, equitable tracing, as well as other relief.

13.     Plaintiff brings this action on behalf of the Plan but, because Plaintiff's claims apply to all Plan Participants who held Ambac Stock in the Plan, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff also brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

### III.   Class Action Allegations

14.     **Class Definition**: Plaintiff brings this action on behalf of the Plan and as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons, excluding Defendants and their immediate families, who were participants in or beneficiaries of the Plan at any time during the Class Period and whose account included an investment in Ambac Stock.

15.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. According to the Plan's annual report on Form 5500 for the year ended December 31, 2006, there were more than 500 Plan participants at the end of the plan year. Upon information and belief, there are hundreds of members of the Class.

16.     **Commonality**:  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include whether:

(a)     Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)     Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries.

(c)     Defendants violated ERISA; and

(d)     Class members have sustained damages and, if so, what is the proper measure of damages.

17.     **Typicality**:  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

18.     **Adequacy**:  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex action, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

19.     **Rule 23(b)(1)(B) Requirements**:  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecuting separate actions for members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

20.     **Other Rule 23(b) Requirements:**  Class action status is also warranted under the other subsections of Rule 23(b) because (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## IV.    JURISDICTON AND VENUE

21.     **Subject Matter Jurisdiction**:  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the laws of the United States." 28 U.S.C. § 1331.

22.     **Personal Jurisdiction**:  ERISA provides for nation-wide service of process, ERISA § 502(e)(2) U.S.C. § 1132(e)(2).  All Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the state courts of New York.

23.     **Venue**: Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this District.

## V.   PARTIES

### A.   Plaintiff

24.     At all relevant times until 2009, **Plaintiff Karthikeyan V. Veera** was a participant in the Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).

25.     During the Class Period, all of Plaintiff's assets in the Plan were invested in Ambac Stock.

26.     During the Class Period, Plaintiff held Ambac Stock in the Plan that was valued at more than $80,000 but by 2009, as alleged below, those shares were valued at slightly more than $1,400 because of Defendants' breaches of fiduciary duty.

### B.   Defendants

27.     Each Defendant is a fiduciary of the Plan within the meaning of ERISA.

28.     **Defendant Ambac** is a Delaware corporation with its principal place of business at One State Street Plaza, New York, New York.

29.     At all relevant times, Ambac's common stock traded on the New York Stock Exchange.

30.     Ambac is a holding company that through its subsidiaries provides financial guarantees and financial services to clients.

31.     The Company's principal operating subsidiary is Ambac Assurance Corporation ("Ambac Assurance"), which was the first company to provide insurance on municipal bonds.

32.     Financial guarantee insurance policies written by Ambac Assurance generally guarantee payment of the principal and interest on the guaranteed obligation.   Through its

subsidiaries, Ambac Assurance provides credit protection in the global markets in the form of structured credit derivatives.

33.     At all relevant times, Ambac had effective control over the Plan-related activities of its directors, officers and employees and acted through its directors, officers and employees who were appointed to perform Plan-related fiduciary functions in the course and scope of their employment.

34.     Through its Board of Directors or otherwise, Ambac had the authority and discretion to hire and terminate those officers and employees and had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan.  Accordingly, the actions of the Board of Directors, the Company's committees and other employee fiduciaries are imputed to Ambac.

35.     At all relevant times Ambac was either a named or de facto fiduciary of the Plan within the meaning of ERISA.

36.     Upon information and belief, Ambac is the Plan's Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  As such, Ambac exercises discretionary authority with respect to managing and administering the Plan or managing and disposing of the Plan's assets.

37.     On information and belief, in order to comply with ERISA, the Company exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform manner.

38.     These communications included the Summary Plan Description ("SPD")  and, on information and belief, other information disseminated by the Company or the Administrative Committee to Plan Participants that incorporated by reference the SEC filings described below,

- 8 -

which contained inaccurate or incomplete information regarding the financial condition of Ambac and its business operations.

39.     Furthermore, on information and belief, Ambac was responsible for preparing and distributing these communications.

40.     Ambac is also a Plan fiduciary because committees under its control maintained direct control over the Plan and its assets.

41.     Upon information and belief, Ambac's Board was also directly responsible for the members of the Administrative Committee.  Upon information and belief, Ambac, through its Board, also had the ultimate authority and obligation to appoint and remove other Plan fiduciaries, if necessary, in order to best serve the interests of Plan Participants.

42.     By failing to properly discharge its fiduciary duties under ERISA, Ambac breached duties it owed to the Plan, its participants and their beneficiaries.

43.     Ambac is imputed with the knowledge that Defendants had regarding the misconduct alleged here, and, hence, like the fiduciaries who acted on Ambac's behalf, should have had knowledge of the imprudent actions alleged herein.

44.     **Defendant Ambac Plan Administrative Committee.**  The Ambac Plan Administrative Committee ("Administrative Committee") is a "Named Fiduciary" of the Plan for purposes of Section 402(a)(2) of ERISA.

45.     The Plan's filings with the Department of Labor and the SEC identify the Administrative Committee as the Administrator of the Plan.

46.     Pursuant to ERISA, the Named Fiduciary of the Plan is a fiduciary.

47.     The Administrative Committee also was a *de facto* fiduciary of the Plan because it and its members exercised discretionary authority and control with respect to managing and administering the Plan and its assets.

48.     **Defendant Sean T. Leonard** ("Leonard") was, until December 4, 2009, the Senior Vice President and Chief Financial Officer of Ambac.

49.     Defendant Leonard was a fiduciary of the Plan and signed Plan filings with the SEC as the administrator of the Plan.

50.     On or about June 27, 2006, June 29, 2007, and June 27, 2008, Defendant Leonard signed annual reports for the Plan on Form 11-K which the Plan filed with the SEC and which represented that Leonard was signing on behalf of the Plan as one of its trustees or as a person who is an administrator of the Plan.

51.     Upon information and belief, Defendant Leonard was a member of the Administrative Committee.

52.     At all relevant times until December 4, 2009, Defendant Leonard was responsible for managing Ambac's financial operations and for managing Ambac's Investor and Rating Agency Relations, Fixed Income Investment Management, and Financial Services businesses.

53.     During the course of his employment and as a result of Defendant Leonard's high-level position at Ambac, Defendant Leonard had access to confidential information related to Ambac's business that was not disclosed to participants in the Plan or to persons outside of Ambac, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of Ambac stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

54.     **Defendant Gregg L. Bienstock** ("Bienstock") was at all relevant times the Senior Vice President and Chief Administrative Officer of Ambac.

55.     In his role at Ambac and Ambac Assurance, Defendant Bienstock had executive responsibility for Human Resources, Global Marketing, Administration and Technology of Ambac.

56.     Defendant Bienstock was a fiduciary of the Plan and signed Plan filings with the SEC and the Department of Labor as the Administrator of the Plan.

57.     On or about June 27, 2006, June 29, 2007 and June 27, 2008, Defendant Bienstock signed annual reports for the Plan on Form 11-K which the Plan filed with the SEC and which represented that Defendant Bienstock was signing on behalf of the Plan as one of its trustees or as a person who is an administrator of the Plan.

58.     During the Class Period, Defendant Bienstock also signed other Plan documents which identified him as a fiduciary of the Plan, including the annual reports on Form 5500 filed by the Plan with the Department of Labor.

59.     The Plan's annual report on Form 5500 filed with the SEC for 2007 identified Defendant Bienstock as the administrator of the Plan.

60.     Upon information and belief, Defendant Bienstock was the Chair of the Administrative Committee during the Class Period.

61.     During the course of his employment at Ambac and as a result of his high-level position at Ambac, Defendant Bienstock had access to confidential information related to Ambac's business that was not disclosed to Participants in the Plan or to persons outside the Company, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of

offering or holding Ambac Stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

62.     During the Class Period, while he was causing the Plan to offer Ambac Stock as a retirement investment, and while the Plan and Participants were acquiring and holding Ambac Stock as a retirement investment, Defendant Bienstock sold his own Ambac Stock for personal proceeds of approximately $500,000.

63.     **Defendant Diana Adams** ("Adams") was at all relevant times a Senior Managing Director of Ambac and Ambac Assurance.

64.     Upon information and belief, at all relevant times Defendant Adams was a member of the Administrative Committee.

65.     In her role at the Company, Defendant Adams was responsible for Ambac's global structured finance business and was responsible for underwriting and insuring billions of dollars in transactions.  She also was responsible for overseeing Ambac's entrance into new markets, products and countries.

66.     In the course of her employment at Ambac and as a result of her high-level position at Ambac, Defendant Adams had access to the confidential information that is the subject of this lawsuit, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of offering or holding Ambac Stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

67.     **Defendant Robert Eisman** ("Eisman") was at all relevant times the Controller of Ambac and Ambac Assurance.

68.   Upon information and belief, at all relevant times Defendant Eisman was a member of the Administrative Committee.

69.   In the course of his employment at Ambac, and as a result of his high-level position at Ambac, Defendant Eisman had access to the confidential information that is the subject of this lawsuit, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of offering or holding Ambac Stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

70.   **Defendant Timothy Stevens** ("Stevens") was at all relevant times a Senior Managing Director of Ambac and Ambac Assurance.

71.   Upon information and belief, at all relevant times, Defendant Stevens was a member of the Administrative Committee.

72.   During the Class Period and until March 2008, Defendant Stevens was the head of Ambac's Global Secondary Markets Group.

73.   Upon information and belief, during the Class Period Defendant Stevens was responsible for Ambac's global derivatives business and its structured finance investment portfolio management.

74.   In the course of his employment at Ambac, and as a result of his high-level position at Ambac, Defendant Stevens had access to the confidential information that is the subject of this lawsuit, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of offering or holding Ambac Stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

75.   **Defendant Anne Gill Kelly** ("Kelly") was at all relevant times a Managing Director of Ambac.

76.   Upon information and belief, at all relevant times Defendant Kelly was a member of the Administrative Committee.

77.   Upon information and belief, at all relevant times Defendant Kelly was Corporate Secretary of Ambac and Assistant General Counsel of the Company.

78.   In the course of her employment at Ambac and as a result of her high-level position at Ambac, Defendant Kelly had access to the confidential information that is the subject of this lawsuit, including information about the fundamental shift in Ambac's business, the loosening of its underwriting standards, the Company's massive exposure to losses, the imprudence of offering or holding Ambac Stock as a Plan investment, and the risks of investing retirement assets in Ambac Stock.

79.   **Jane and John Doe Defendants**:  Plaintiff does not currently know the identity of all Plan fiduciaries, including the identity of all members of the Administrative Committee, during the Class Period.  Therefore, Plaintiff has named some of those fiduciaries fictitiously as defendants John and Jane Doe 1-10 and will seek leave to join them under their true names if and when Plaintiff ascertains their true identity.

80.   During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan because each Defendant had discretionary authority with respect to management of the Plan or the management or disposition of the Plan's assets.

81.   During the Class Period, each Defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

82.     ERISA requires every plan to have one or more "named fiduciaries." ERISA §
402(a)(1), 29 U.S.C. § 1102(a)(1).   The person named as the "administrator" in the plan
instrument is automatically a named fiduciary, and in the absence of such a designation, the
sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

83.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under
§ 402(a)(1), but also any other persons who in fact perform fiduciary functions. *See* ERISA §
3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Thus, a person is a fiduciary to the extent he or she "(i)
exercises any discretionary authority or discretionary control respecting management of such
plan or exercises any authority or control respecting management or disposition of its assets, (ii)
renders investment advice for a fee or other compensation, direct or indirect, with respect to any
moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has
any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

84.     Each Defendant was a fiduciary with respect to the Plan and owed fiduciary
duties to the Plan and the participants in the manner and to the extent set forth in the Plan's
documents, under ERISA, and by virtue of that Defendant's conduct.

85.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. §
1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of
the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under
the circumstances then prevailing that a prudent man acting in a like capacity and familiar with
such matters would use in the conduct of an enterprise of a like character and with like aims.

86.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all
aspects of the Plan's management and administration.  Rather, as set forth below, Defendants
were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by

each of them, and the claims against each Defendant are based on such specific discretion and authority.

87.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, Ambac chose to assign the appointment and removal of fiduciaries to itself and the other Monitoring Defendants named herein. These persons and entities in turn selected Ambac employees, officers and agents to perform most fiduciary functions.

88.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions. ERISA § 408(c)(3), 29 U.S.C. § 11 08(c)(3). However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the plan sponsor.

## VI.    THE PLAN

89.    The Plan is an "employee pension benefit Plan," as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

90.    The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

91.    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a).

92.    During the Class Period employees of Ambac were eligible to participate in the Plan if they had completed at least six months of service in which the employee was credited with at least 500 hours of service.

93.    Ambac Stock was one of several investment options available for Plan participants.

94.    During 2006, the Ambac Stock Fund was the Plan's largest investment.

95.    As of December 31, 2006, $23,526,585 in Plan assets was invested in Ambac Stock. The next largest investment in the Plan for that year was valued at $7.9 million.

96.    During the Class Period the Plan did not limit the ability of the Plan fiduciaries to remove Ambac Stock as an investment option.

## VII.    Substantive Allegations

97.    Ambac was the first company to insure municipal bonds against the risk of default.

98.    Starting in 1971 when it was founded, Ambac repeatedly portrayed itself as insuring only those financial obligations that were of investment grade quality with a remote risk of loss.

99.    Ambac's historically conservative business model allowed it to consistently obtain the top credit rating of "AAA" from the major credit rating agencies.

100.   The Company's credit rating was crucial to its ability to operate profitably because Ambac insured financial products which depended upon Ambac's credit rating.

101.   Issuers - - Ambac's clients - - demanded that insurers like Ambac have top-tier credit ratings.

102.   Ambac's credit ratings in turn depended upon Ambac's loss reserves and its exposure to liability under its insurance contracts.

103.   Any material increase in Ambac's exposure to losses would jeopardize Ambac's top-tier credit rating as well as its ability to operate profitability.

104.    Historically, Ambac's ratings were secure because Ambac had successfully managed its exposure on the only type of insurance it offered - - insuring municipal bonds.

105.    However, before the Class Period, Ambac underwent a fundamental shift in focus and began to insure structured financial products, which materially increased the risk to Ambac and jeopardized its financial viability.

106.    In particular, before and during the Class Period, Ambac began insuring the risk of default on Residential Mortgage-Backed Securities ("RMBS") and other Collateralized Debt Obligations ("CDOs") which significantly increased the risk to Ambac.

107.    This type of insurance provided an unconditional guarantee by Ambac that it would make the payments if the obligor failed to pay because of a default or other covered event.

108.    The potential profitability on these types of insurance contracts was higher but the associated risk of liability also was much greater than on insurance for municipal bonds.

109.    As an example of the extent of the dramatic change in Ambac's business, Ambac's net exposure on one type of CDO increased from $900 million in 2004 to $29 billion as of December 31, 2007.

110.    Upon information and belief, because of the extreme growth in Ambac's exposure to loss, during the Class Period a small failure of Ambac's insurance portfolio would jeopardize Ambac's financial viability.

111.    In fact, although Defendants did not disclose it, as the real estate and credit markets came under pressure before and during the Class Period, Ambac was experiencing significant problems which jeopardize its AAA rating as well as its financial viability.

112.    Throughout the Class Period, Defendants did not truthfully disclose Ambac's exposure to losses, they understated Ambac's liabilities, they failed to disclose the negative

trends that Ambac was experiencing, they failed to mark-to-market the value of Ambac's default protection products and they failed to take adequate loss reserves for Ambac's exposure.

113.    As the financial crisis deepened in the United States, Defendants repeatedly portrayed Ambac as having the strongest underwriting guidelines that distinguished the Company and insulated it from the significant writedowns that other companies were experiencing and they falsely represented that the Company only guaranteed investment-grade obligations with a remote risk of loss.

114.    During this time, the Plan and its participants were acquiring and holding Ambac Stock at prices that were artificially inflated.

115.    Instead of investing their retirement assets in other alternatives in the Plan which out-performed Ambac Stock, the Plan and its Participants invested in Ambac Stock which would be decimated when the market began to learn the truth about Ambac's problems.

116.    It was not until October 10, 2007 that Ambac first revealed that it estimated Ambac would have an unrealized loss of $743 million on its credit derivative portfolio.

117.    Despite the enormous loss, Ambac's press release quoted Ambac's Chief Executive Officer Robert Genader and Defendant Leonard positively portraying the Company as confident in its underwriting standards, credit standards and transactions.

118.    In the press release, Defendant Leonard noted the $743 million in unrealized losses but represented that "Ambac does not view the current adjustments as predictive of future claims. Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our account analysis of the portfolio, management believes that the potential for material paid claims is very low. Importantly, the Company's claims paying

resources, as prescribed by the rating agencies, are not impacted by mark-to-market adjustments."

119.    Defendant Leonard would retire "early" when, contrary to his representations in the October 10, 2007 press release, the market began to learn the truth about Ambac's financial problems and Ambac's Stock price was decimated.

120.    In response to the October 10, 2007 announcement about the large losses, Ambac's stock price - - which had closed as high as $96.08 per share during the Class Period - - began to drop precipitously, taking with it the value of the retirement assets in the Plan that were invested in Ambac Stock.

121.    Two weeks later, on October 24, 2007 Ambac announced a third quarter 2007 net loss of $360.6 million compared to net income of $213.5 million for the third quarter of 2006. Ambac attributed the huge loss to the unrealized loss on its credit derivative exposures amounting to $743.4 million as it had announced on October 10, 2007.

122.    Following the Company's announcements on October 10, 2007 and October 24, 2007, the Company's Stock price continued to fall to approximately $25 per share, eliminating a material portion of the Plan's value that had been invested in Ambac Stock.

123.    On January 16, 2008 more bad news followed when Ambac announced that it would have a $5.4 billion loss on its CDOs portfolio for the fourth quarter of 2007 as well as a $1.1 billion credit impairment charge and a loss of up to $32.83 per share for the fourth quarter of 2007.

124.    Defendants also announced that the Company had replaced Robert J. Genader as the Company's Chief Executive Officer. By that time, however, Mr. Genader had already sold a

large portion of his own Ambac Stock for millions of dollars in proceeds at the same time that Defendants were offering that Stock to participants as a retirement investment under the Plan.

125.    Following the January 16th announcement, the Company's stock price fell further to $6.24 per share, taking with it the retirement assets in the Plan that were invested in Ambac Stock which had been trading at prices of up to $96.08 per share during the Class Period.

126.    On January 18, 2008 the ratings service Fitch downgraded Ambac's vital credit rating, making the Company the first bond insurer to lose its "AAA" rating.  Moody's and Standard & Poor's had also placed Ambac on review for possible downgrade.

127.    Upon information and belief, by January 2008, Ambac had been notified that Massachusetts regulators were investigating whether Ambac failed to disclose its guarantees of troubled structure financed investments to issuers of municipal bonds in the state.

128.    On January 30, 2008 the market began to learn more about the true extent of Ambac's financial exposure when a research and investment firm posted to a website information about Ambac's RMBS and CDO transactions.

129.    In response, Ambac's stock price continued to fall as participants and the market learned more about the extent of Ambac's financial problems.

130.    On April 23, 2008 Ambac announced a $1.6 billion loss for the first quarter of 2008, a $1.7 billion loss on its CDS exposures, and a credit-impairment charge of $1 billion.

131.    Defendant Leonard admitted that "on some exposures . . . losses could reach as high possibly as 80%."

132.    Ambac's stock price continued its fall to $3.46 per share, taking with it the value of the Plan's investment in Ambac stock.

133.   On July 2, 2008 the Company's stock price fell below $1.05 per share and trading was temporarily halted.

134.   Ambac's stock currently trades at approximately $1.00 per share, which is far below the inflated prices at which the Plan acquired and held the stock during the Class Period.

135.   As the price of Ambac's Stock price plummeted, so too did the value of the retirement assets in the Plan that were invested in Ambac Stock.

136.   As of December 31, 2006, more than $23 million in Plan assets was invested in Ambac Stock, and Ambac Stock was the largest investment held by the Plan.

137.   By the end of 2007 as the price of Ambac Stock declined, the value of the Plan's holdings in Ambac Stock decreased to $11 million.

138.   By the end of 2008, the value of the Ambac Stock in the Plan was worth only $1.2 million.

139.   The following chart shows the decline in the price of Ambac's Stock during the Class Period:



140. Throughout the Class Period, Ambac was exposed to and suffered substantial losses. As the Company's problems continued throughout the Class Period, Defendants should have known that the value of the Company's stock would suffer and, consequently, that the heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants. However, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Ambac stock.

141. As described above, certain Defendants had a very strong financial incentive to conceal the truth of the Company's potential exposure and keep the Company's stock price artificially high—and did exactly that.

142. Defendants reassured or misled Plan participants during the Class Period and did nothing to protect the heavy investment of the Plan's retirement savings in Ambac Stock.

143. Ambac's dissemination of inaccurate, incomplete and materially misleading statements prevented the market and Plan participants from realistically assessing the risks of investing retirement assets in Ambac Stock, thus resulting in the overvaluation and artificial inflation of the stock. Defendants further should have known that the Company's stock price would plummet—and that the Plan's assets would suffer tremendously and unnecessarily—once the truth became known.

144. Through their high-ranking positions within the Company, Defendants should have known of the existence of the severe problems at Ambac.

145.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

146.    As a result of the enormous erosion of the value of Company Stock, the Plan and its participants suffered unnecessary and unacceptable losses.

147.    As a result of Defendants' negligence and, at times, their implication in creating and maintaining misconceptions concerning the true financial risks to the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Ambac Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing retirement assets in inflated Company stock.

148.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

149.    Defendants also failed to conduct an appropriate investigation into whether Ambac Stock was a prudent investment for the Plan and failed to provide the Plan's participants with information regarding Ambac's problems and risks so that participants could make informed decisions regarding whether to acquire and hold Ambac Stock in the Plan.

150.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Ambac Stock under these circumstances was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

151.    Because Defendants should have known that Ambac was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Ambac Stock.

152.    Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures; divesting the Plan of Ambac Stock; discontinuing further contributions to or investment in Ambac Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Ambac or their own interests they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Ambac Stock.

153.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Ambac Stock. In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as Ambac's problems came to light.

## VIII.  Remedy for Breaches of Fiduciary Duty

154.    Defendants breached their fiduciary duties in that they should have known the facts as alleged above, and therefore should have known that Ambac Stock was an imprudent investment for the Plan during the Class Period.  As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

155.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan.

156.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.

157.   Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...."

158.   Section 409 also authorizes "such under equitable or remedial relief as the court may deem appropriate...."

159.   With respect to calculating the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries of the Plan would not have made or maintained investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.

160.   The Plan has suffered tens of millions of dollars in principal losses because Defendants imprudently invested the Plan's assets in Ambac Stock or offered Ambac Stock as a Plan investment during the Class Period when it was imprudent to do so, in breach of Defendants' fiduciary duties.

161.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interests on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

162.    Plaintiff, on behalf of the Plan, seeks alternate types of relief under ERISA.

163.    First, Plaintiff, on behalf of the Plan, seeks the profits the Plan lost by investing in Ambac Stock instead of investing in other funds within the Plan that were available at the time and which have outperformed the returns of Ambac Stock.

164.    Second, Plaintiff, on behalf of the Plan, seeks to recover the losses that the Plan incurred by investing retirement funds in Ambac Stock when the stock price was artificially inflated.

165.    Third, Plaintiff, on behalf of the Plan, seeks to recover the losses caused to the Plan when the price of Ambac Stock declined significantly as the market began to learn the truth about Ambac's improper practices and financial problems as alleged herein.

166.    Fourth, Plaintiff, on behalf of the Plan, seeks a Constructive Trust over all amounts by which the Plan fiduciaries benefited as a result of their breaches.  In particular, Plaintiff seeks to impose a Constructive Trust on the amounts received by Defendants for selling their Ambac Stock, including amounts that certain Defendants received when they sold Ambac Stock at the same time that those Defendants were causing the Plan to use Plan assets to acquire and hold that stock.

167.    In addition, Plaintiff seeks equitable relief and such other relief as is appropriate under ERISA.

## IX.    The Relevant Law

168.    ERISA § 502(a)(2), 29 U.S.C. § 1 132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

169.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary. See U.S.C. § 1002(21)(A).

170.    When fiduciaries put the interests of the company or their own interests ahead of the interests of plan participants, they violate ERISA. A fiduciary may, therefore, be personally liable to plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets. ERISA § 409(a), 29 U.S.C. § 1109(a).

171.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

172.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide that a fiduciary shall discharge duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

173.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence.

174.    It is a breach of the duty of loyalty for a fiduciary to withhold information that the fiduciary should know participants need to make informed choices.

175.    A fiduciary has the duty to disclose and inform which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or

should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

176.   A plan fiduciary is also responsible for the selection and monitoring of plan investments, including in this instance the Ambac Stock Fund, which invested in Ambac Stock, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan. This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

177.   A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur. As such, a plan fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

178.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

(i)     In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(ii)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(iii)   if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(iv)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

179.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of a fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given decision, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary did not participate in a breach, if he knows of a breach, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

180.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## X.    Causes of Action

### A.    Count One:    Failure to Prudently and Loyally Manage the Plan's Assets (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

181.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

182.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

183.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Ambac Stock in the Plan were prudent and that such investments were consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

184.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

185.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan's assets, and to disclose

information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all of the Plan's investment options, including investment in Ambac Stock.

186.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants should have known that, as described herein, Ambac Stock was not a suitable and appropriate Plan investment option. Investment in Ambac Stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses to the Plan and to participants' retirement savings.

187.    During the Class Period, Defendants failed to take any meaningful steps to protect the Plan and its Participants from the inevitable losses that they should have known would ensue as the non-disclosed material problems and financial exposure took hold and became public.

188.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the prudence of investing retirement assets through

the Plan, so that participants can make informed decisions with regard to their investment options available under the Plan.

189.    Defendants breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition, the Company's concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. Defendants conveyed inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in Ambac Stock.

190.    Further, during the Class Period, upon information and belief, Defendants fostered a positive attitude toward the Company's stock or allowed Plan Participants to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, Plan Participants could not appreciate the true risks presented by investing in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

191.    Had the Defendants not constantly reinforced the safety, stability and prudence of investing in Ambac Stock during the Class Period, Plan Participants, to the extent they were permitted, could have divested their holdings of Ambac Stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses.

192.    Defendants also breached their co-fiduciary obligations by participating in, or undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company Stock. Defendants

had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy the same.

193.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion of its retirement investment.

194.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**B.     Count Two:   Breach of Duty to Avoid Conflicts of Interest (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

195.     Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

196.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

197.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty which requires the fiduciary to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

198.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities, and by otherwise placing their own interests or the Company's interests above the interests of the participants with respect to the Plan's investments in Company Stock.

199.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.

200.    If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion of its retirement investments.

201.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

C.    **Count Three: Failure to Adequately Monitor Other Fiduciaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 Against All Defendants)**

202.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

203.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

204.    At all relevant times, the scope of Defendants' fiduciary responsibilities included the responsibility to appoint, evaluate and monitor other fiduciaries, including the members of the Administrative Committee.

205.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.

206.    Defendants had the duty to:

(a)     Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must have been knowledgeabl : about the behavior of the Plan and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that monitored fiduciaries maintained adequate records of the information on which they were basing their decisions and analysis with respect to the Plan's investment options; and

(f)     Ensure that the monitored fiduciaries reported regularly to the Company or the other Defendants who, in turn, must have then reviewed, understood and approved the conduct of these "hands-on" fiduciaries.

207.     Under ERISA, a monitoring fiduciary must also ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect the plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

208.    Defendants breached their fiduciary monitoring duties by (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Ambac Stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank-and-file employees in Ambac Stock, an investment that was imprudent and subject to inevitable and significant depreciation.

209.    Defendants should have known that the fiduciaries they were responsible for monitoring were allowing the Plan to continue offering Ambac Stock as an investment alternative when it no longer was prudent to do so and failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

210.    In addition, Defendants, in connection with the monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Ambac that they should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties.

211.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

212.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion of their retirement investments.

213.    Pursuant to ERISA § 502(a), 29 U.S.C. §1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## XI.    Causation

214.    Defendants' violations of fiduciary duty have caused losses to the Plan and its Participants.

215.    Because of Defendants' breaches, the Plan and Plan Participants used retirement assets to acquire and hold Ambac Stock at prices that were artificially inflated and overly risky.

216.    Because of Defendants' breaches, the Plan and Plan Participants used retirement assets to invest in Ambac Stock instead of other alternative investments in the Plan, including alternative Plan investments which out-performed the returns on Ambac Stock.

217.    When investors began to learn the truth about the problems at Ambac, the Company's stock price declined, taking with it the vested retirement benefits of the Plan.

218.    The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Ambac Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

219.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, the Plan and its Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in Ambac Stock.

## XII.    Prayer for Relief

**WHEREFORE**, Plaintiff prays for an Order:

A.    declaring that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and its Participants;

B.      declaring Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      compelling Defendants to make good to the Plan all losses to the Plan resulting from their breaches of fiduciary duties, including losses to the Plan resulting from imprudent investments of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched as the result of breaches of fiduciary duty;

E.      enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      determining actual damages in the amount of any losses the Plan suffered, to be allocated amount the participants' individual accounts in proportion to the accounts' losses;

G.      allocating the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Ambac Stock in proportion to the account's diminution of vested benefits attributable to the decline in the price of Company Stock in the Plan;

H.      awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      awarding attorneys' fees and expenses pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      awarding equitable restitution, other appropriate equitable and monetary relief against Defendants, and such other and further relief as is appropriate.

Dated: May 21, 2010

SQUITIERI & FEARON, LLP

By:_____
            Stephen J. Fearon Jr.
            Caitlin Duffy
            Garry T. Stevens, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: 212-421-6492
Fax: 212-421-6553

Attorneys for Plaintiff