UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KARTHIKEYAN V. VEERA,

            Plaintiff,

   v.

AMBAC PLAN ADMINISTRATIVE
COMMITTEE, et al.,

           Defendants.

---

Case No: 1:10-CV-4191 (HB)

## PLAINTIFF'S MEMORANDUM OF LAW OPPOSING
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr.
Caitlin Duffy
Garry T. Stevens, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: 212-421-6492
Fax: 212-421-6553
stephen@sfclasslaw.com
caitlin@sfclasslaw.com
garry@sfclasslaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF FACTS ....................................................................................... 4

A. Ambac Undergoes A Fundamental Shift In Its Business Model
And Drastically Increases Its Risk Exposure While Defendants
Ignore Al Signs Of Trouble And Take No Action To Protect
The Plan And Its Participants ............................................................................... 4

B. Defendants Had Authority Under ERISA And The Plan To
Remove Or Suspend The Investment Of Ambac Stock As An
Investment Alternative .......................................................................................... 8

1. The Purpose of the Plan is to Help Participants Save for Retirement ............... 8

2. The Defendants Were Tasked With Administering the Plan and Managing the
Plan's Assets ...................................................................................................... 9

III. STANDARD OF REVIEW ON A MOTION TO DISMISS ................................. 11

IV. ARGUMENT .......................................................................................................... 12

A. Plaintiff States A Viable Claim For Breach Of The Duty To
Manage The Plan's Assets Prudently And Loyally .......................................... 12

1. Plan Fiduciaries Cannot Avoid Their ERISA Fiduciary Obligations .............. 12

2. The Plan Does Not Immunize Defendants From Their Fiduciary Obligations .............. 15

3. Defendants Cannot Avoid Liability For Failing to Satisfy ERISA's Prudent
Man Standards By Conflating Their General Duty Of Prudence With
Diversification .................................................................................................. 17

4. A Presumption of Prudence is Premature at This Stage of the Litigation ...................... 19

5. Even If The Court Were To Apply The *Moench* Presumption Here,
Plaintiff's Allegations Overcome the Presumption ........................................ 20

6. The Financial Crisis Does Not Excuse Defendants' Breaches of Fiduciary
Duty .................................................................................................................. 24

i

7. Plaintiff's Allegations that the Stock was Artificially Inflated State a Prudence Claim.................................................................................................................................26

    a. Purchasing And Holding Stock at an Artificially Inflated Price is Never Prudent...................................................................................26

    b. Defendants Cannot Avoid Liability by Invoking The Securities Laws.........................................................................................27

B. Count I Properly Alleges A Claim For Defendants' Breach Of Loyalty To the Plan ...........................................................................29

C. Plaintiff Has Adequately Pled The Fiduciary Status Of All Defendants...........................30

D. Plaintiff Has Adequately Pled A Failure To Monitor Claim Against The Compensation Committee ..........................................................................32

E. Plan Committees Are Proper Defendants Under ERISA ...................................................34

CONCLUSION...............................................................................................................................34

# TABLE OF AUTHORITIES

*In re Ambac Financial Group, Inc. Sec. Litig.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................................1, 2, 27

*Armstrong v. LaSalle Bank Nat'l Ass'n,*
    446 F.3d 728 (7th Cir. 2006) ....................................................................................21

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)..................................................................11

*In re Bausch & Lomb, Inc. ERISA Litig.,*
    No. 06-CV-6297, 2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) .............................19

*In re Beazer Homes USA, Inc. ERISA Litig.,*
    No. 07-0952, 2010 WL 1416150 (N.D. Ga. Apr. 2, 2010)..........................................19

*Bixler v. Central Penn. Teamsters Health & Welfare Fund,*
    12 F.3d 1292 (3d Cir. 1993) ......................................................................................29

*Braden v. Wal-Mart Stores, Inc.,*
    No. 08-CV-3798, 2009 WL 4062105 (8th Cir. Nov. 25, 2009) ..................................30

*Brieger v. Tellabs, Inc.,*
    No. 06-CV-1882, 2009 WL 1565203 (N.D. Ill. June 1, 2009)....................................27

*Bunch v. W.R. Grace & Co.,*
    555 F.3d 1 (1st Cir. 2009)..........................................................................................29

*Central States, Se. and Sw. Areas Pension Fund v. Central Transport, Inc.,*
    472 U.S. 559 (1985)...................................................................................................12

*In re Citigroup ERISA Litig.,*
    No. 07-CV-9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009)................................14

*Coleman v. Interco Inc. Divisions' Plans,*
    933 F.2d 550 (7th Cir. 1991) .....................................................................................13

*Crocker v. KV Pharmaceutical Co.,*
    No. 09-198, 2010 WL 1257671 (E.D.Mo. Mar. 24, 2010)..........................................21

*Dann v. Lincoln Nat'l Corp*,
    708 F. Supp. 2d 481 (E.D. Pa. 2010)..................................................................17, 21

*DeFelice v. U.S. Airways, Inc.*,
    497 F.3d 410 (4th Cir. 2007) ......................................................................................13

*Dobson v. Hartford Finance Services Group*,
    389 F.3d 386 (2d Cir. 2004) .......................................................................................30

*Dovovan v. Bierwirth*,
    680 F.2d 263 (2d Cir. 1982) .......................................................................................12

*Edgar v. Avaya, Inc.*,
    503 F.3d 340 (3d Cir. 2007) .......................................................................................21

*Ershick v. United Missouri Bank of Kansas City*,
    948 F.2d 660 (10th Cir.1991) .....................................................................................13

*In re Ferro Corp. ERISA Litig.*,
    422 F. Supp. 2d 850 (N.D. Ohio 2006) ..............................................................21, 27

*Foman v. Davis*,
    371 U.S. 178 (1962)....................................................................................................35

*In re Ford Motor Co. ERISA Litig.*,
    590 F. Supp. 2d 883 (E.D. Mich. 2008) .............................................................14, 21

*Gearren v. McGraw-Hill Co., Inc.*,
    690 F. Supp. 2d 254 (S.D.N.Y. 2010) ..............................................................13, 24,
                                                                                                  25

*In re General Growth Properties, Inc. ERISA Litig.*,
    No. 08-cv-6680, 2010 WL 1840245 (N.D. Ill. May 6, 2010) .....................................25

*Globe Woolen Co. v. Utica Gas & Electric Co.*,
    224 N.Y. 483 (N.Y. 1918) ...........................................................................................29

*In re Goodyear Tire & Rubber Co. ERISA Litig.*,
    438 F. Supp. 2d 783 (N.D.Ohio 2006) .......................................................................21

*In re Halpin ERISA Litig.*,
    566 F.3d 286 (2d Cir. 2009) .......................................................................................26

*Herman v. NationsBank Trust Co.*,
    126 F.3d 1354 (11th Cir. 1997) ..................................................................................13

iv

*Hill v. BellSouth Corp.*,
313 F. Supp. 2d 1361 (N.D. Ga. 2004).......................................................................21

*In re Honeywell Int'l ERISA Litig.*,
No. 03-1214, 2004 WL 3245931 (D.N.J. Sept. 14, 2004)...................................21, 28

*Int'l Swaps and Deriv.Ass'n, Inc. v. Socratek, L.L.C.*,
712 F. Supp. 2d 96 (S.D.N.Y. 2010) ..........................................................................24

*Keach v. U.S. Trust Co.*,
419 F.3d 626 (7th Cir. 2005) ......................................................................................24

*Kuper v. Iovenko*,
66 F.3d 1447 (6th Cir. 1995) ................................................................................13, 14

*In re Lehman Brothers Sec. & ERISA Litig.*,
683 F. Supp. 2d 294 (S.D.N.Y. 2010) ........................................................................25

*Liss v. Smith*,
991 F. Supp. 278 (S.D.N.Y. 1998) .............................................................................32

*Maccharulo v. Gould*,
643 F. Supp. 2d 587 (S.D.N.Y. 2009) ........................................................................11

*Mellot v. Choicepoint, Inc.*,
561 F. Supp. 2d 1305 (N.D. Ga. 2007).......................................................................19

*In re Merck & Co. Sec. Deriv. & ERISA Litig.*,
No. 05-2369, 2006 WL 2050577 (D.N.J. Jul 11, 2006) .............................................21

*Moench v. Robertson*,
62 F.3d 553 (3d Cir. 1995) ................................................................................*Passim*

*In re Morgan Stanley ERISA Litig.*,
696 F. Supp. 2d 345 (S.D.N.Y. 2009) ................................................................*Passim*

*Morrison v. Moneygram Int'l*,
607 F. Supp. 2d 1033 (D.Minn. 2009)...................................................................21, 22

*Newton v. Van Otterloo*,
756 F. Supp. 1121 (N.D. Ind. 1992) ...........................................................................33

*Noa v. Keyser*,
519 F. Supp. 2d 481 (D.N.J. 2007).............................................................................34

*Patten v. Northern Trust Co.*,
    703 F. Supp. 2d 799 (N.D.Ill, 2010) ......................................................................31, 32

*Pedraza v. Coca-Cola Co.*,
    456 F. Supp. 2d 1262 (N.D. Ga. 2006) .........................................................................19

*In re Pfizer Inc. ERISA Litig.*,
    No. 04-CV-10071, 2009 WL 749545 (S.D.N.Y. Mar. 20, 2009)................................30

*In re Polaroid ERISA Litig.*,
    362 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................. *Passim*

*Rankin v. Rots*,
    278 F. Supp. 2d 853 (E.D.Mich. 2003) ........................................................................22

*In re Regions Morgan Keegan ERISA Litig.*,
    692 F. Supp. 2d 944 (W.D. Tenn. 2010) ......................................................................33

*In re Sears, Roebuck & Co., ERISA Litig.*,
    No. 02-8324, 2004 WL 407007 (N.D.Ill. Mar. 3, 2004) .............................................21

*Shanehchian v. Macy's, Inc.*,
    No. 07-828, 2009 WL 2524562 (S.D.Ohio Aug. 14, 2009) ...........................14, 21, 27

*In re Shering-Plough ERISA Litig.*,
    No. 08-1432, 2010 WL 2667414 (D.N.J. June 29, 2010)............................................21

*Shirk v. Fifth Third Bancorp*,
    No. 05-49, 2007 WL 1100429 (S.D. Ohio Apr. 10, 2007)....................................18, 21

*Sidmore v. Swift & Co.*,
    323 U.S. 134 (1944)......................................................................................................26

*Sims v. First Horizon Nat'l Corp.*,
    No. 08-2293, 2009 WL 3241689 (W.D. Tenn. Sept. 30, 2009) ...................................14

*In re SLM Corp. ERISA Litig.*,
    No. 08-Civ. 4334, 2010 WL. 3910566 (S.D.N.Y. Sep. 24, 2010).........................13, 25

*Smith v. Delta Airlines, Inc.*,
    422 F. Supp. 2d 1310 (N.D. Ga. 2006) .........................................................................19

*In re Sprint Corp. ERISA Litig.*,
    388 F. Supp. 2d 1207 (D.Kan. 2004)............................................................................21

*Stein v. Smith*,
   270 F. Supp. 2d 157 (D.Mass. 2003) ........................................................................21

*Taylor v. Keycorp*,
   678 F. Supp. 2d 633 (N.D. Ohio 2009) ....................................................................21

*Tellabs Inc. v. Makor Issues & Rights, LTD*,
   551 U.S. 308 (2005) ..................................................................................................11

*Urban v. Comcast Corp.*,
   No. 08-CV-773, 2008 WL 4739519 (E.D.Pa. Oct. 28, 2008) ..............................27, 28

*Wolff v. Rare Medium, Inc.*,
   171 F. Supp. 2d 354 (S.D.N.Y. 2001) .......................................................................11

*In re WorldCom, Inc.*,
   263 F. Supp. 2d 745 (S.D.N.Y. 2003) ..................................................................27, 33

*In re Xerox Corp. ERISA Litig.*,
   483 F. Supp. 2d 206 (D. Conn. 2007) ........................................................................27

## I.    INTRODUCTION

Plaintiff brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), for himself and the other participants in the Ambac[1] Savings Incentive Plan (the "Plan") who collectively have lost tens of millions of dollars of their retirement savings by investing in artificially inflated Ambac stock through the Plan. Defendants are the fiduciaries of the Plan who breached their ERISA-mandated duties by imprudently offering Ambac stock as a retirement investment when the Company was on the verge of collapse.

In a parallel securities class action, Judge Buchwald recently upheld securities fraud claims against Ambac and a number of its officers and directors (including Defendants Leonard, Considine, Theobald, Unger, and Wallace) where the plaintiffs-investors alleged claims under the much higher pleading standards of the PSLRA[2] and Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Ambac Financial Group, Inc. Securities Litig.* ("*Ambac Sec. Litig.*"), 693 F. Supp. 2d 241, 262-63 (S.D.N.Y. 2010). This ERISA case, unlike the securities case, is subject to the much lower pleading threshold of Rule 8 but Judge Buchwald found -- as Plaintiff alleges here -- that in the time leading up to the Class Period[3], Ambac engaged in a fundamental shift in its business which exposed it to enormous, undisclosed liability and which, when disclosed, caused the Company's stock price to plummet and the Company to collapse.[4]

---

[1] "Ambac" and "the Company" as used herein refer collectively to Ambac Financial Group, Inc. and Ambac Assurance Corporation ("Ambac Assurance.")

[2] "PSLRA" refers to The Private Securities Litigation Reform Act.

[3] The "Class Period" is defined as the period from October 1, 2006 through July 2, 2008.  Amended Class Action Complaint For Violations Of The Employee Retirement Income Security Act Of 1974 ("Complaint"), ¶ 5. References to paragraphs in the Complaint will be denoted as "¶".

[4] *See* Yahoo Finance, available at *http://finance.yahoo.com/q?s=abk* (last visited on November 5, 2010).

As Plaintiff alleges here, historically Ambac offered default insurance on investment - grade municipal bonds that had a remote risk of loss. ¶¶ 172-172; *see also Ambac Sec. Litig.*, 693 F. Supp. 2d at 249. But then Ambac began to insure much riskier structured financial products such as Residential Mortgage Backed Securities ("RMBS") and Collateral Debt Obligations ("CDOs"), which heightened the Company's risk of significant loss. On one type of CDO alone, Ambac's net exposure to loss increased from $900 million in 2004 to $29 billion ($29,000,000,000) by 2007. ¶ 184; *see Ambac Sec. Litig., 693 F. Supp. 2d at 249.*

As the real estate and financial markets collapsed, Ambac faced devastating losses because it had insured these risky CDOs and RMBSs and had guaranteed to pay the obligations of the borrowers if they ever defaulted. During the Class Period, while Defendants were offering Ambac stock as a retirement investment, Ambac could not actually pay its insurance obligations and its business was collapsing, leading Wisconsin's Office of the Commissioner for Insurance (the "Wisconsin OCI")[5] to seize control of Ambac's assets and set up a special receivership fund in an effort to protect Ambac's policyholders and creditors. In addition to its growing exposure to losses on these CDOs and RMBSs, Ambac's other insured investments continued to deteriorate, its credit ratings and statutory surplus plummeted, it was unable to generate new business, and it stopped writing new insurance policies. As a result, the Company's stock price plummeted from a Class Period high of $96.08 per share to approximately $0.60 (sixty cents) per share, taking with it the value of the Plan's retirement assets that were invested in Ambac stock. During the Class Period, Ambac stock had been the largest investment by far in the Plan. *See* ¶¶ 149, 217 (alleging that Ambac stock was the largest investment in the Plan and that in 2006 the

---

[5] Ambac Assurance is a Wisconsin-domiciled insurer. Accordingly, the Wisconsin OCI had authority to bring enforcement proceedings against Ambac.

Plan held approximately $23 million of Ambac shares compared to the next-largest investment which was worth $7.9 million).

In many ERISA cases, the defendant company's stock price declines somewhat when the market learns adverse information about the company, and the stock price often rebounds later to the pre-disclosure prices. The defendants in this type of ERISA case often argue that the problems at the company were so peripheral or immaterial that the Court should not allow the case to proceed. But the circumstances here are significantly different. This case involves a total collapse of the Company and its stock price from its Class Period high of $96.08 per share (¶ 199)[6] to its current price of approximately $0.50 per share, reflecting the pervasive problems that this Company experienced at the same time that Defendants were offering Ambac stock as a retirement investment in the Plan.[7] The losses in ERISA cases do not get much worse than they are here. There has been no rebound in the stock price since its collapse and the cause for the drop in value involved the Company's primary business, which has now been seized by a state regulator. The problems are so pervasive that Ambac recently announced that it had defaulted on a required interest payment and is planning a pre-packaged bankruptcy proceeding. *See* Ambac Form 8-K, filed with the SEC on November 1, 2010.[8]

At the same time that the fiduciaries of the Plan were offering inflated Ambac stock to participants as a retirement investment, those fiduciaries -- who were some of the highest-ranking officers and directors of the Company -- should have known that Ambac was on the verge of collapse because of its enormous exposure to liability on insurance policies that it wrote,

---

[6] "In response to the October 10, 2007 announcement about the large losses, Ambac's stock price - - which had closed as high as $96.08 per share during the Class Period - - began to drop precipitously, taking with it the value of the retirement assets in the Plan that were invested in Ambac Stock."

[7] *See*, http://www.marketwatch.com/investing/stock/abk.

[8] Available at http://www.sec.gov/Archives/edgar/data/874501/000119312510241913/d8k.htm.

its inability to write new insurance policies, its declining credit rating which was crucial to its business, and the deterioration of the assets that Ambac insured.

Defendants are unable to credibly contest Plaintiff's allegations that Ambac was on the verge of collapse and they cannot deny that the Plan and its participants have lost tens of millions of dollars in retirement savings. Instead, Defendants seek to reframe federal law by suggesting that the Court should apply legal standards that would completely relieve all plan fiduciaries of their statutory obligations under ERISA, regardless of their chronic imprudent behavior.

Even if this Court were to apply a presumption of prudence to Defendants' actions as Defendants suggest in their brief, Plaintiff's detailed allegations overcome any such presumption. The Complaint satisfies Rule 8 and provides Defendants with notice of the claims against them. Plaintiff's detailed allegations plausibly suggest that Ambac stock became an imprudent investment for the Plan during the Class Period and that Defendants breached their fiduciary duties by continuing to offer it and by taking no actions whatsoever to prevent or minimize those losses. As a result, the Court should deny Defendants' motion.

## II.     STATEMENT OF FACTS

### A.     AMBAC UNDERGOES A FUNDAMENTAL SHIFT IN ITS BUSINESS MODEL AND DRASTICALLY INCREASES ITS RISK EXPOSURE WHILE DEFENDANTS IGNORE ALL SIGNS OF TROUBLE AND TAKE NO ACTION TO PROTECT THE PLAN AND ITS PARTICIPANTS

Ambac, through its principal operating subsidiary Ambac Assurance, was the first company to insure municipal bonds against the risk of default. ¶¶ 34, 172. From its inception, Ambac portrayed itself as insuring only those financial obligations that were of investment grade quality with a remote risk of loss. ¶ 173. The Company's business model over time earned it the top credit rating of "AAA" from the major credit rating industry – a designation that was crucial to its ability to generate new business and operate profitably, with clients demanding that Ambac

maintain its top-tier status.   ¶ 174-76.   The Company's credit ratings depended on its loss reserves and its exposure to liability under its insurance contracts with any increase in exposure putting Ambac at risk of a ratings downgrade.   ¶ 177-78.   This was never an issue for decades because the Company adequately managed its risk and maintained appropriate levels of loss reserves primarily by insuring low-risk municipal bonds.   ¶ 179.

But before the start of the Class Period, Ambac underwent a fundamental shift in focus and began to insure structured financial products that were inherently more risky than municipal bonds.   ¶ 180.   In particular, Ambac began insuring the risk of default on RMBSs and other CDOs, offering an unconditional guarantee that the Company would make payments if the obligor failed to pay because of default or other covered event.   ¶¶ 181-82.   The riskiness of these toxic assets was exacerbated by the reality that any downgrade in Ambac's credit rating – which could follow from only a small failure of Ambac's insurance portfolio – would jeopardize the Company's entire operation.

Even though the risk of liability from insuring the RMBS and CDO markets was so much higher than Ambac's traditional business (¶ 183), between 2004 and 2007 Ambac increased its net exposure to the structured finance market by tens of billions of dollars.   ¶¶ 184 - 185.   As an example of the dramatic change in Ambac's business, the Company's net exposure on one type of CDO increased from $900 million in 2004 to $29 billion as of December 31, 2007.   ¶ 184.   Its exposure had increased by $28 billion in three years.   At the same time, a financial crisis born out of the irresponsible expansion of the subprime mortgage market was gripping the country and exposing Ambac to huge losses.   By no later than the end of the third quarter of 2006, it should have been clear to Defendants - - who included high-level officers of the Company and had access to Ambac's financial information - - that the Company was in serious risk of

collapsing as a result of Ambac's foray into the toxic asset market and its enormous exposure to liability as a result of insuring these real estate-related structured finance products. ¶ 187. However, in spite of their knowledge and access to this information, the Defendants-Fiduciaries continued to offer Ambac stock as a retirement investment in the plan and failed to disclose to participants the risk of investing their retirement assets in Ambac Stock.

Defendants continued to shirk their fiduciary obligations even after Ambac started reporting record losses on October 10, 2007 initiating a collapse that would ultimately bring Ambac's stock value from $96.08 per share down to $0.60 per share. ¶¶ 199, 215. In the face of a third quarter $743 million loss to its credit derivative portfolio and mounting concerns over its risky subprime exposures, Defendants failed to take any action to limit Plan participants' investment in Ambac Stock or to even investigate the prudence of continuing to invest retirement assets in Company Stock. ¶¶ 195-96, 200-202. By January 18, 2008, in response to a fourth quarter $5.4 billion loss on its CDO portfolio and the continued precipitous decline in the Company's stock value, Moody's and Standard & Poor's – the two major ratings agencies – lowered Ambac's credit rating. ¶¶ 203-206. Without its "AAA" rating, Ambac's was not only facing a barrage of additional liabilities, but was also unable to generate new business. ¶ 207. Still, Defendants did nothing to stem the losses to Plan participants' life savings.

As the Company was experiencing these serious problems it terminated or replaced several of the key decision-makers that had led the Company into massive financial trouble. For example, on January 18, 2008, just three months after the Company announced its first major loss, Ambac's CEO, Robert Genader, was replaced. ¶¶ 203-204. Defendant McKinnon – Senior Managing Director and Chief Risk Officer – abruptly resigned three weeks later on February 8, 2008. ¶ 48. Once the market learned that Defendant Leonard's October 10, 2007

statements were false and Ambac's stock price had been decimated, Defendant Leonard took an "early" retirement on December 4, 2009. ¶¶ 54, 198.

By the beginning of 2008, Ambac was also under scrutiny from multiple government organizations and regulators for its failure to protect investors and its deepening financial crisis which threatened its ability to survive and to pay its policyholders. In January of 2008, Massachusetts regulators were investigating whether Ambac had failed to disclose material information regarding its troubled structure finance investments to issuers of municipal bonds. ¶ 209. At the same time, the Wisconsin OCI had started an investigation into Ambac Assurance in order to protect investors from further financial loss (¶ 210) – an investigation that ultimately resulted in OCI bringing a receivership action against the Company in March of 2010 in which assets were placed into a segregated account established by the Court to protect policyholders and creditors. ¶ 221.

Meanwhile, the Plan participants' retirement savings were evaporating as Ambac's stock price plummeted. By the end of the Class Period the value of Ambac Stock held by the Plan – which had accounted for the largest percentage of all assets held by the Plan (¶ 149)[9] – had fallen from more than $23 million to only $1.2 million. ¶¶ 217-19. Plaintiff alone lost more than $78,000 as the Ambac stock in his account plummeted from approximately $80,000 to $1,400. ¶ 30.

Defendants blatantly disregarded these red flags and warning bells and continued along their path of imprudence by offering Ambac Stock as a retirement investment. By July 2, 2008, Ambac Stock fell so far that the New York Stock Exchange temporarily suspended its trading at $1.05. ¶ 214. Ambac Stock now trades at approximately $0.50 per share and the Company

---

[9]     As of December 31, 2006, $23,526,585 in Plan assets was invested in Ambac Stock. The next largest investment in the Plan for that year was valued at $7.9 million. ¶ 150.

recently disclosed its plan to file for bankruptcy protection. *See* Ambac 2009-2008 Form 11-K, filed with the SEC on June 29, 2010.

**B.    DEFENDANTS HAD AUTHORITY UNDER ERISA AND THE PLAN TO REMOVE OR SUSPEND THE INVESTMENT OF AMBAC STOCK AS AN INVESTMENT ALTERNATIVE**

**1.    The Purpose of the Plan is to Help Participants Save for Retirement**

The Ambac Savings Incentive Plan is an "employee pension benefit plan" as defined by ERISA §3(2)(A). ¶ 135. The Plan was unquestionably designed to help employees save for their retirement, not as a means to acquire Company Stock. The Company explicitly describes the Savings Plan as a means to "provide eligible employees with a convenient way to save on a regular and long-term basis." *See* Ambac Financial Group, Inc. Savings Incentive Plan (Amended and Restated as of January 1, 2006) ("Plan Terms"),[10] Section I. In order to effectuate this goal, during the Class Period, Plan participants were permitted to defer a percentage of their pay for investment in the Plan. ¶ 144; Plan Terms, § 4.2. The Company matched one hundred percent (100%) of every dollar up to the first six percent (6%) that a participant contributed to the Plan prior to January 2, 2010. *See* Plan Terms, §4.7(a) as amended on Oct. 20, 2009.[11] During the Class Period, the Company also made discretionary profit-sharing contributions to the Plan participants. *See* Plan Terms, §4.6.

---

[10]    A true and correct copy of the Plan Terms is attached to the Complaint as Exhibit A.

[11]    A true and correct copy is attached to the Complaint as Exhibit B.

2.    **The Defendants Were Tasked With Administering the Plan and
      Managing the Plan's Assets**

During the Class Period, the responsibilities for administering the Plan were divided among three committees and a Plan Administrator— all fiduciaries under ERISA.  ¶ 153.

The Investment Committee was a named fiduciary of the Plan (Plan Terms § 11.11), and was vested with "the *exclusive* responsibility and authority *to control and manage the assets of the Plan* in accordance with the terms of the Plan and of the Trust."  ¶ 154, Plan Terms, § 11.6(a) (emphasis added).   Under the Plan, the Investment Committee was expressly charged with directing investments in the trust fund in accordance with Plan objectives as well as reviewing and making recommendations to the Compensation Committee on *any* matter affecting the Trust whenever it deemed necessary.  ¶ 155, Plan Terms § 11.6(b) (emphasis added).  Significantly the Investment Committee could also limit trading and delay effecting transfers to "protect the interests" of Participants and their beneficiaries.  ¶ 168, Plan Terms, § 5.1(d) as amended on January 1, 2008.[12]

The Administrative Committee was also a named fiduciary (Plan Terms § 11.11) and maintained "final authority" with respect to the Plan's operation.  ¶ 157, Plan Terms § 11.5(a). The Plan's terms expressly granted the Administrative Committee "the power and duty to take *all actions* and to make *all decisions* necessary or proper to carry out its responsibilities under the Plan . . ." (¶157); the authority "to construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan . . ."(¶ 158); and the power to adopt amendments which were necessary or appropriate to facilitate the administration of the Plan.  ¶ 166.

The Compensation Committee was appointed by the Plan as a monitoring fiduciary, and given the authority to appoint the members of the Administrative and Investment Committees

---

[12]      A true and correct copy is attached to the Complaint as Exhibit C.

and evaluate the performance and policies of those committees as well as any other employee engaged in administering the Plan or Trust Fund.   ¶ 161, Plan Terms § 11.2(b)(2).

Finally, the Plan Administrator – specifically designated as the individual in the position held by Defendant Bienstock throughout the Class Period – maintained the "power and authority to take *all actions necessary and proper* to carry out its responsibilities under the Plan." ¶ 164. The Plan Administrator's responsibilities included, without limitation, interpreting the Plan and making factual determinations with regard to *any* matter related to the Plan.   ¶¶ 164-65, Plan Terms, §11.7.   Defendant Bienstock had discretion to take any discretionary actions under the Plan. ¶ 164, Plan Terms, §11.7(a).

As is evident under the terms of the Plan, the Committees and Individual Defendants had discretionary authority with respect to selecting investment options for the Plan.   Indeed, the Ambac Stock Fund was just one of several investment options available for Plan participants. During the Class Period, the Plan did not limit the ability of the Plan fiduciaries, including the Investment and Administrative Committees, to remove Ambac Stock as an investment option, freeze investment in Ambac Stock, or otherwise limit it to Plan participants as prudence and reason dictated.  *See, e.g.,* Plan Terms, § 13.1(h), *Restrictions on Amendments* (containing no limitations that would prohibit the committees or any fiduciary from suspending investment in the Fund or removing the Fund as an investment alternative). ¶167.  In fact, the Summary Plan Description which was effective during the Class Period (attached as Exhibit 1 to the Fearon Declaration), contains no language designating the Stock Fund as a "Required" Offering under the Plan.  The Ambac Stock Fund was not defined by the Plan until January 1, 2008 – only four months prior to the end of the Class Period. ¶ 148. *See* January 1, 2008 Amendment (attached

to the Complaint as Exhibit C) ("'*Ambac Financial Group, Inc. Stock Fund*' or the 'Stock Fund' means an Investment Fund that is invested primarily in the stock of the Company.")

### III.    STANDARD OF REVIEW ON A MOTION TO DISMISS

In an ERISA action like this, the liberal pleading requirements of FED. R. CIV. P. 8 apply. *See In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("*Iqbal*") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).[13]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct  at 1949.  "This plausibility standard does not amount to a 'probability requirement,' but it calls for more than a 'sheer possibility that a defendant has acted unlawfully.'"  *Maccharulo v. Gould*, 643 F. Supp. 2d 587, 592 (S.D.N.Y. 2009) (quoting *Iqbal*); *see also*, *Green, et al. v. Beer, et al.*, No. 06-CV-4156, slip op. at 8 (S.D.N.Y. Oct. 22, 2009) (holding that in *Iqbal*, "the Supreme Court did not overrule or contradict *Twombly*, but rather clarified the applicable pleading standard by identifying two working principles [that] underlie [its] decision in *Twombly*.").[14]  As examined below, the Complaint pleads sufficient facts to survive Defendants' motion to dismiss.

---

[13]  Moreover, in deciding a Rule 12(b)(6) motion, the Court may only consider: (i) the complaint, (ii) statements or documents incorporated into the complaint by reference; (iii) documents relied upon in the complaint; and (iv) matters of which the Court may take judicial notice. *Tellabs Inc. v. Makor Issues & Rights, LTD*, 551 U.S. 308, 322 (2005).  To that end, Plaintiff opposes Defendants' attachment of Exhibits D-F and I-K to their Motion to Dismiss.

[14]  Defendants cite to *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) for the assertion that "[l]iberal construction has its limits."  However, because *Wolff* predates *Twombly* and *Iqbal*, the Court should focus its inquiry on the pleading requirements set forth in *Twombly* and reiterated in *Iqbal*.

## IV.   ARGUMENT

**A.   PLAINTIFF STATES A VIABLE CLAIM FOR BREACH OF THE DUTY TO MANAGE THE PLAN'S ASSETS PRUDENTLY AND LOYALLY**

**1   Plan Fiduciaries Cannot Avoid Their ERISA Fiduciary Obligations.**

ERISA's fiduciary obligations are the "highest known to the law" (*Dovovan v. Bierwirth*, 680 F.2d 263, 278 n.8 (2d Cir. 1982) (Friendly, J)) and require plan fiduciaries to act prudently with respect to employer stock even if that stock was mandatory under the Plan. *See* 29 U.S.C. § 1104(a)(1)(D); Brief Of *Amicus Curiae* Hilda L. Solis, Secretary Of The United States Department Of Labor in Support Of Appellants Requesting Reversal in *Gearren v. McGraw-Hill Co. Inc., et al.* (DOL *Gearren* Amicus), Nos. 10-792, 10-934, at 11 (2d Cir. June 4, 2010).[15] Defendants' contention that they are immune from judicial inquiry by virtue of the Plan's terms would require the Court to disregard ERISA's statutory mandates.  As the Supreme Court has explained, "trust documents cannot excuse trustees from their duties under ERISA." *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.* 472 U.S. 559, 568 (1985). Accepting Defendants' argument would relieve each defendant of ERISA's obligation to "discharge his duties with respect to a plan... in accordance with the documents and instruments governing the plans insofar as such documents and instruments are consistent with the provisions of this subchapter."  29 U.S.C. § 1104(a)(1)(D); Brief of the Secretary of the United States Department of Labor as *Amicus Curiae* Supporting Appellants in *In re Citigroup ERISA Litig.*, 09-3804-cv, at *7 (2d Cir. Dec. 28, 2009) ("DOL *Citigroup* Amicus")[16] (collecting cases and explaining that the judicial immunity argument "is flatly contradicted by ERISA section

---

[15] The DOL *Gearren* Amicus is available at http://www.dol.gov/sol/media/briefs/gearren(A)-6-4-2010.htm, last visited on November 5, 2010.

[16] The DOL *Citigroup* Amicus is available at http://www.dol.gov/sol/media/briefs/citigroup(A)-12-28-2009.htm, last visited on November 5, 2010.

404(a)(1)(D).")

While the Second Circuit has yet to determine the issue,[17] other circuit courts have rejected similar attempts by defendants to avoid liability by hiding behind the plan's language. *See e.g. Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1369 n.15 (11th Cir. 1997) (holding that "the trustee must disregard the provision, just like it would have to disregard any other plan provision controlling the disposition of plan assets which leads to an imprudent result"); *Kirschbaum* 526 F.3d at 256 (expressly rejecting the notion of judicial immunity); *DeFelice v. U.S. Airways, Inc.* 497 F.3d 410, 420 (4th Cir. 2007) (recognizing fiduciary duty to consider "removal or closure of a company fund", that was mandated with regard to company match).[18]

District court judges have also rejected the position taken by Defendants or refused to apply it. *See e.g. In re SLM Corp. ERISA Litig.,* No. 08-Civ. 4334, 2010 WL 3910566 at *6 (S.D.N.Y. Sep. 24, 2010) (Pauley, J.) ("While the Court of Appeals has yet to consider this argument, ERISA does not provide fiduciaries carte blanche to follow plan documents under all circumstances"); *Gearren v. McGraw-Hill Co., Inc.*, 690 F. Supp. 2d 254, 264 (S.D.N.Y. 2010) (Sullivan, J.) (rejecting this approach as contrary to ERISA); *In re Bank of America ERISA Litig.*, No. 09 MD 2058, 2010 WL 3448197, *18-19 (S.D.N.Y. Aug. 27, 2010) (Castel, J) (noting that the district court is split and deciding not to reach the issue of whether defendants' decision was

---

[17] This issue is currently pending for the Court of Appeals in *In re Citigroup ERISA Litig.*, 09-3804-cv (2d Cir. Sept. 9, 2009).

[18] *See also Ershick v. United Missouri Bank of Kansas City,* 948 F.2d 660, 666 (10th Cir.1991) ("In exercising their powers, however, ERISA fiduciaries are required to interpret their plans 'in accordance with the documents governing the plan insofar as such documents and instructions are consistent with ERISA § 1104(a)(1).'") (citation omitted); *Kuper v. Iovenko,* 66 F.3d 1447, 1457 (6th Cir. 1995) ("a fiduciary may only follow plan terms to the extent the terms are consistent with ERISA"); *Coleman v. Interco Inc. Divisions' Plans,* 933 F.2d 550, 551 (7th Cir. 1991) (when ERISA and plan language diverge, "ERISA is [sic] trumps"); *Moench v. Robertson*, 62 F.3d 553, (3d Cir. 1995) ( holding that the fiduciary defendants' interpretation of the plan was unreasonable because "it is at odds with a fiduciary's responsibility under the common law of trusts, which mandates that the trustee in certain narrow instances must take actions at odds with how it is directed generally to act. Therefore, the [defendant's] interpretation of the plan is unreasonable and we reject it.)

judicially immune); *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 358 (S.D.N.Y.

2009) (Sweet, J.) (in the face of defendants' argument that the plan immunized them from their

fiduciary obligations, the court held that plaintiffs' pleadings, similar to those made here,  rose

above the speculative level and declined to dismiss plaintiffs' claims on these grounds).[19]

Contrary to the weight of this authority, Defendants' case law is of no help to them.

Defendants rely heavily on *In re Citigroup ERISA Litig.*, No. 07-CV-9790, 2009 WL 2762708

(S.D.N.Y. Aug. 31, 2009), which is currently on appeal to the Court of Appeals and has been

expressly rejected by the Department of Labor.  Plaintiff respectfully suggests that the Court in

*Citigroup* was wrong to ignore without explanation ERISA's overarching prudent person

standard and the Supreme Court jurisprudence described above.

If courts applied Defendants' standard, ERISA would have no meaning or effect because

fiduciaries could simply replace the actual standards imposed by the statute with a less onerous

one by simply writing it down in a Plan document.  Fortunately, ERISA does not countenance

such conduct.  *See Ford*, 590 F. Supp. 2d at 889 ("Indeed, ERISA would be almost impotent if it

permitted settlors to exempt their fiduciaries from its requirements with a simple stroke of the

pen"); *see also Kuper*, 66 F.3d at 1457) ("ERISA provides that a fiduciary may only follow plan

terms to the extent that the terms are consistent with ERISA"); *Shanehchian v. Macy's, Inc.*, No.

07-cv-0828, 2009 WL 2524562, at *5 (S.D. Ohio Aug. 13, 2009) (rejecting defendants'

contention "that they had no discretion to remove the Macy's Stock Fund as an investment

---

[19] *See also In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, No. 08-md-1919, slip op. at 12
(W.D. Wash. Oct. 5, 2009) ("The Court is not persuaded that the language creating the ESOP is enough to
immunize Defendants from any potential liability as fiduciaries."); *Sims v. First Horizon Nat. Corp.*, No.
08-2293-STA-cgc,  2009 WL 3241689, at *24 (W.D. Tenn. Sept. 30, 2009); ("A plan does not impose on
a fiduciary an unquestioning duty to follow the terms of a plan where doing so would be imprudent."); *In
re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 889-90 (E.D. Mich. 2008) (holding that plan
fiduciaries have a duty to ignore plan language if acting pursuant to that language would be imprudent).

option") (*citing Kuper*).

Even if a plan purports to unequivocally require a particular investment, a fiduciary is duty-bound to override the plan terms if it would be imprudent to follow the provision. As the Secretary of Labor has explained, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under the part" is "void as against public policy." DOL *Citigroup* Amicus at 9-10. Thus, plan fiduciaries are liable for their imprudence even if the plan document gives them no discretion, and the Court should reject Defendants' attempt to avoid liability on these grounds.

## 2.     The Plan Does Not Immunize Defendants From Their Fiduciary Obligations

Defendants suggest that the Court should interpret the Plan documents in such a way that would give them a free pass for having abdicated their ERISA responsibilities. In effect, they argue that their hands were tied because the Plan required them to offer Ambac Stock and so they should not be held responsible for shirking their duties under ERISA. But nothing about the Plan prevents Defendants from abiding their ERISA mandated duties. Rather, the Plan provides Defendants with ample discretion to select, eliminate or modify investment options under the Plan if it would be prudent to do so and in order to protect Plan participants. *See* Section II.B.

As detailed above, the Plan expressly provides the Administrative and Investment Committees with the discretion to limit trading in any of the Investment Funds – including the Ambac Stock Fund – if the Committee determined that such action is "necessary to protect the interests of other Participants and their Beneficiaries." *See* ¶ 168 (citing Plan Terms § 5.1 (d) as amended on January 1, 2008.). In conjunction with the Plan, the Trust Agreement Section 2.1 provides that

> the Employer shall have the exclusive authority and discretion to select
> investment funds ("Investment Funds") available for investment under the

15

Plan. In making such selection, *the employer shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.* The available instruments under the Plan shall be sufficiently diversified so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

(emphasis added). Nowhere in this provision of the Trust is the Ambac Stock Fund excluded from this prudence requirement and therefore Defendants had the discretion to remove, suspend or otherwise limit it as an option under the Plan.

Defendants rely solely on the convoluted definition of "*Investment Fund*" in the Definitions section of the Plan as supposed proof that they were required to offer the Fund as an investment alternative. But any ambiguity about this should be decided in Plaintiff's favor. *Washington Mutual*, 2009 WL 3246994, at *6. Moreover, Defendants' conclusion is flawed because the Plan does not limit the discretion of the fiduciaries to eliminate the Stock Fund if that is in the interests of the Plan participants. *See* Plan, Ex.A, ¶ 1 adding the definition of Stock Fund to the Plan (emphasis added). Read as a whole, a reasonable interpretation of the Plan provides Defendants with discretion to protect Plan participants from losses resulting from investments in Ambac Stock. *See Moench*, 62 F.3d at 567-68 (holding that when read with the plan's other terms, the plan's language was ambiguous and defendants' purported interpretation was therefore unreasonable.)

Defendants also rely on language in the 2008 Summary Plan Description ("SPD") which did not become effective until October 1, 2008, after the Class Period had ended. The prior operative SPD, effective January 1, 2002 which is attached as Exhibit 1 to the Fearon Decl., contains no language designating the Stock Fund as a "required" offering under the Plan.

The Court should disregard Defendants' suggestion that the Court defer to Defendants' interpretation of the Plan documents because this is a self-serving interpretation made in the

16

course of this litigation.  Moreover, given that this is a fact-intensive inquiry and Defendants

have yet to produce to Plaintiff the document discovery that Plaintiff has requested, it would be

premature to apply Defendants' self-serving interpretation of the Plan on this Motion. *See*

*Moench*, 62 F.3d at 567-68  (on review of a the district court's decision on cross-motions for

summary judgment, holding "that because the record is devoid of any evidence that the

Committee construed the plan at all… this is not a case implicating the arbitrary and capricious

standard of review.").

Defendants' arguments on this motion ignore that Defendants had discretionary authority

over the Plan and that the Plan merely permitted, but did not require, the offering of Company

Stock as an investment option for the Plan.  As a result, Defendants' investment decisions are

subject to *de novo* review by this Court.  *See, e.g., Dann v. Lincoln National Corp*, 708 F. Supp.

2d 481, 489 (E.D. Pa. 2010).  But even if the Court were to find that the Plan required

Defendants to offer Ambac Stock as an investment, Defendants had a duty to override the Plan's

terms to protect the interests of the Plan and its participants.

**3.      Defendants Cannot Avoid Liability For Failing to Satisfy ERISA's Prudent Man
         Standard By Conflating Their General Duty Of Prudence With Diversification.**

Defendants seek to avoid their fiduciary obligations by mischaracterizing Plaintiff's duty

of prudence claim as a diversification claim. Def. Br. at 16-18.[20]  But these arguments are

misplaced because Plaintiff is not asserting a claim that Defendants failed to diversify.  Instead,

---

[20] Defendants confuse the meaning of "divest" with "diversify" to invoke the 404(a)(2) safe harbor
provision.  But the plain meaning of each word makes clear that they are fundamentally different. To
divest is "to deprive or dispossess especially of property, authority, or title."  Divest. (2010). Merriam-
Webster  Online  Dictionary  (Retrieved  October  31,  2010  from http://www.merriam-
webster.com/dictionary/divest).  To diversify is "to balance (as an investment portfolio) defensively by
dividing funds among securities of different industries or of different classes."  Diversify. (2010).
Merriam-Webster  Online  Dictionary  (Retrieved  October  31,  2010  from http://www.merriam-
webster.com/dictionary/diversify). This latter definition is expressly contemplated by Plan documents and
governs the Plan as a whole and as ERISA intended is not meant to limit the Plan's fiduciaries when
investing in a particular fund would lead to an improper result. *See* Plan Trust Agreement, § 2.1.

Plaintiff alleges that Defendants violated their general prudence obligations by continuing to offer Ambac stock when it was an imprudent investment because of the Company's serious financial problems and the likelihood that the Company would collapse. ¶¶ 7, 185-186, 187, 193-194, 206-214, 220-221; *see e.g.* Order, *Almonor v. BankAtlantic, Inc. et al.*, No 07-cv-61862, [No. 82] at 14 (S.D. Fla. July 15, 2009) ("The Court views the argument that there should have been more investment options on the table in an effort to minimize risk (i.e. a question of diversification) as distinct and different from an argument that the options on the table were imprudent (*i.e.* a question of proper management)") (attached hereto to Fearon Decl. as Exhibit 2). *See also Shirk v. Fifth Third Bancorp*, No. 05-cv-49, 2007 WL 1100429, *10 (S.D. Ohio Apr. 10, 2007) (rejecting similar arguments made by Defendants here); *In re JDS Uniphase Corp. ERISA Litig.*, No., C03-04743 CW, 2005 WL 1662131, *7 (N.D. Cal. July 14, 2005) (same).

Plaintiff's allegations that Defendants' acted imprudently by investing in Ambac stock is firmly rooted in the requirements of ERISA which states in relevant part: "[i]n the case of an [EIAP[21]]… the diversification requirement [of this section] and the prudence requirement (*only to the extent that* it requires diversification) [of this section] [are] not violated by acquisition or holding of qualifying employer … securities…." ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2) (emphasis supplied).

By the clear words of the statute, an EIAP fiduciary, while exempt from diversifying the Plan's investment outside of Company stock, is still required to act loyally and satisfy his general obligation to act prudently. Had Congress intended to immunize EIAP fiduciaries of their obligations with this provision they would not have included the parenthetical. Legislative

---

[21] "EIAP" means an "eligible individual account plan" under ERISA, 29 U.S.C. § 1107(d)(3)(A). The Plan here is an EIAP.

history confirms that Congress was committed to holding fiduciaries to the highest standards, which includes EIAP fiduciaries to act prudently with respect to employer securities. Specifically, Congress noted:

> A proviso to section 14(d) and to section 14(f)(4)(A) insulates profit sharing, stock bonus, thrift and savings, and similar plans which otherwise fall within the scope of the bill from a diversification requirement with respect to investments in the stock or securities of the employer whose employees are participants in the plan. This proviso is not intended to insulate such plans from other applications of the prudent man rule. *Thus, if investment by a profit-sharing plan in the employer is completely unsound the prudent man rule should operate to preclude such investment.*

A&P H.R. Rep. 90-1867 at 8 (emphasis supplied). Thus, as explained above, Defendants are still subject to ERISA's fiduciary requirements even when the Company's stock is the subject of the litigation.

Plaintiff agrees with Defendants that an EIAP prudence claim cannot be based on a fiduciary failing to diversify the investment portfolio of a plan. *See* Def. Br. at 17. But as already explained, Plaintiff has not asserted such a claim.[22]

**4.    A Presumption of Prudence is Premature at This Stage of the Litigation.**

While Defendants correctly point out that some courts have adopted the *Moench* presumption[23], the Second Circuit has yet to do so and this Court need not do so now.[24] This

---

[22] Defendants' reliance on non-binding authority originating from the Northern District of Georgia is unpersuasive here for the reasons already explained in this Section. *See* Def. Br. at 18 citing *Mellot v. Choicepoint, Inc.*, 561 F. Supp. 2d 1305, 1311-12 (N.D. Ga. 2007); *Smith v. Delta Airlines, Inc.*, 422 F. Supp. 2d 1310, 1327 (N.D. Ga. 2006); *Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1274-75 (N.D. Ga. 2006); *In re Beazer Homes USA, Inc. ERISA Litig.*, No. 07-0952, 2010 WL 1416150 (N.D. Ga. Apr. 2, 2010). Moreover, Defendants misconstrue *Kirschbaum*'s dicta as a holding; but the court did not dismiss plaintiff's prudence claim as a diversification claim. *Id.*, 66 F.3d 248-249. Likewise, Defendants quote *In re Bausch & Lomb, Inc. ERISA Litig.*, No. 06-CV-6297, 2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) and *Citigroup*, 2009 WL 2762708 in support of their arguments here but neither court dismissed plaintiffs' claims on this basis.

[23] *Moench v. Robertson*, 62 F.3d 347 (3d Cir. 1995).

[24] This issue is currently pending before the Court of Appeals in *Gearren v. McGraw-Hill*, No. 10-792 (2d Cir. Mar. 4, 2010) and *Citigroup*, No. 09-3804-cv.

presumption, originating from the Third Circuit, finds no support in ERISA's statutory text, structure, or purpose. *See DOL Gearren Amicus* at 11-17 (explaining why this presumption is contrary to ERISA).

Even if the Court were to determine that the *Moench* presumption applies here based on the Plan language, this is not the stage of the litigation to apply that presumption. Courts have routinely noted that presumptions are evidentiary standards that should not be applied to motions to dismiss. *See Morgan Stanley,* 696 F. Supp. 2d at 359 ("The reasoning of cases that have found it inappropriate to dismiss a claim of mismanagement without giving the Plaintiffs a chance to overcome the presumption is persuasive and the Moench presumption will not be applied at this stage."). Notably, *Moench* itself was decided on cross motions for summary judgment. *Id.*, 62 F.2d at 562.

### 5.   Even If The Court Were To Apply The *Moench* Presumption Here, Plaintiff's Allegations Overcome the Presumption.

Defendants argue that the only means by which a Plaintiff can overcome the presumption of prudence at the pleading stage is by establishing that the company was at risk of "imminent collapse." Plaintiff disagrees that this is the proper standard. In fact, when the courts have applied a presumption of prudence, many of them have rejected the need for Plaintiffs to allege that the Company faced "imminent collapse." Contrary to the draconian pleading requirements urged by Defendants, courts have regularly rejected this as the only way to satisfy this presumption. *See Krischbaum*, 526 F.3d at 256 ("We do not hold that the *Moench* presumption applies only in the case of investments in stock of a company that is on the brink of collapse."); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 n.13 (3d Cir. 2007) (noting that it "does not interpret *Moench* as requiring a company to be on the brink of bankruptcy before a fiduciary is required to divest a plan of employer securities."). Specifically, courts have held that a plaintiff may

overcome the presumption by alleging that: the fiduciaries failed to consider whether investment in company stock remained a prudent investment (Plaintiff alleges that at ¶¶ 226-27);[25] the fiduciaries knew or should have known that continuing to offer and invest in the company's stock in the plan was unduly risky given the business and financial state of the company in consideration of the plan's purpose (Plaintiff alleges that at ¶¶ 133, 187, 224, 269);[26] the fiduciaries continued to invest plan assets in company stock when they knew or should have known that the stock price was inflated (Plaintiff alleges that at ¶¶7-8);[27] more than one of these factors was alleged;[28] or the Company's financial viability was substantially threatened as a

---

[25] *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733-34 (7th Cir. 2006).

[26] *See e.g. Moench v. Robertson*, 62 F.3d at 557, 572; *Dann v. Lincoln Nat'l Corp.*, 708 F.Supp.2d at 490-91 (precipitous decline in stock price combined with large exposure to risky mortgage loans); *Taylor v. Keycorp*, 678 F. Supp. 2d 633, 640 (N.D. Ohio 2009) (noting that "[w]hile plaintiffs did not allege that Key was on the verge of failure," they did allege that fiduciaries knew of the company's "high risk conduct, …, requiring a government bailout and a huge dividend reduction"; *Morrison v. Moneygram Int'l*, 607 F. Supp. 2d 1033, 1053 (D.Minn. 2009) (presumption of prudence is overcome by company's "pursuit of an extraordinarily speculative and unnecessary investment strategy that involved borrowing money and investing it in risky mortgage-backed securities"); *Ford*, 590 F. Supp. 2d at 892.

[27] *See e.g. Shanehchian v. Macy's, Inc.*, No. 07-828, 2009 WL 2524562, at *7 (S.D.Ohio Aug. 14, 2009); *Shirk v. Fifth Third Bancorp*, No. 05-49, 2007 WL 1100429, at *10 (S.D. Ohio Apr. 10, 2007); *In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783, 793-94 (N.D.Ohio 2006); In re Ferro Corp. ERISA Litig., 422 F. Supp. 2d 850, 861 (N.D. Ohio 2006); *In re Honeywell Int'l ERISA Litig.*, No. 03-1214, 2004 WL 3245931, at *11 (D.N.J. Sept. 14, 2004); *In re Sears, Roebuck & Co., ERISA Litig.*, No. 02-8324, 2004 WL 407007, at *4-5 (N.D.Ill. Mar. 3, 2004); *Stein v. Smith*, 270 F. Supp. 2d 157, 164, 172 (D.Mass. 2003).

[28] *See e.g. In re Pfizer Inc. ERISA Litig.*, No. 04-cv-10007 (LTS)(JFE), 2009 WL 749545, at *12 (S.D.N.Y. Mar. 20, 2009) (allegations that Pfizer had not disclosed critical information about the drugs Celebrex and Bextra, and that there were equally critical business risks associated with those drugs, were sufficient to overcome the presumption). *See also In re Shering-Plough ERISA Litig.*, No. 08-1432, 2010 WL 2667414, at *5 (D.N.J. June 29, 2010) (company's failure to disclose critical information and that there were serious business risks associated with their product overcame presumption); *Crocker v. KV Pharmaceutical Co.*, No. 09-198, 2010 WL 1257671, at *21 (E.D.Mo. Mar. 24, 2010); *Jones v. MEMC Elec. Material*, No. __, 2010WL 1038536, at *5 (E.D. Mo. Mar. 17, 2010) (disruptions in business practices along with an artificially inflated stock price satisfied the presumptions); *In re Merck & Co. Vytorin ERISA Litig.*, No. 08-1974, 2009 WL 2834792, at *3 (D.N.J. Sept. 1, 2009); *In re Merck & Co. Sec. Deriv. & ERISA Litig.*, No. 05-2369, 2006 WL 2050577, at *7 (D.N.J. Jul 11, 2006); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1224-25 (D.Kan. 2004); *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1367-68 (N.D. Ga. 2004) (artificial inflation of stock combined with high-risk business practices, together overcame the presumption).

going concern (*see* ¶¶ 175-78, 187, 193, 194, 206, 209, 210, 231).[29]

Recognizing that Plaintiff has met every standard ever applied to an ERISA motion to dismiss, Defendants invent another one, arguing that a plaintiff must allege that a company be at risk of imminent collapse "at the time it became imprudent to hold employer securities."  Def. Br. at 17.  No court has ever applied such a pleading standard.  In support of their new theory, Defendants ironically cite case after case limiting the application of the *Moench* presumption to situations where the viability of the company is threatened (Def. Br. at 19-27), but completely neglect to address Ambac's own dire financial situation or Plaintiff's allegations to that effect. *See* ¶ 7 (summarizing the specific problems faced by the  Company during the Class Period); ¶ 206 (In January 2008, the rating agency Fitch downgraded the Company's rating and other agencies contemplated similar actions); ¶ 207 ("With its liabilities growing and its credit rating plummeting, Ambac's prospects for generating new business were evaporating and its chances of recovery were decreasing"[30]); ¶ 220 ("Since late 2009, Ambac has warned creditors and investors alike that it may be necessary for the Company to seek bankruptcy protection"); ¶¶ 209-210, 221-222 (alleging that in January 2008 the Wisconsin Office of the Commissioner of Insurance ("OCI") began investigating whether to take action against Ambac Assurance to protect investors from "dire financial loss" and that the investigation resulted in OCI assuming

---

[29] *In re Polaroid ERISA Litig*., 362 F. Supp. 2d 461, 475-77 (S.D.N.Y. 2005); *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D.Mich. 2003); *Morrison*. 607 F. Supp. 2d at 1053 (noting that "[a]lleging the employer was on the verge of collapse is certainly one way to show that the employer's stock was excessively risky, but it would be inconsistent with ERISA to hold, as a matter of law, that such an allegation is the only way to state a claim.")

[30] The Company has since disclosed that because it was downgraded it has been unable to write any new business impacting its future business prospects. *See* Ambac Form 10-K at 10, filed April 29, 2009, available at http://www.sec.gov/Archives/edgar/data/874501/000119312510080450/d10k.htm.

control of Ambac Assurance which was the same as a Bankruptcy Credit Event.)[31]

Nevertheless, even if that was the standard, financial circumstances do not get more dire than those alleged here. Even if the Court were to apply the *Moench* presumption at this early stage of the case and require Plaintiff to allege "imminent collapse" the Complaint overcomes the presumption by alleging that Ambac actually was on the verge of collapse. Specifically, as a result of fundamentally shifting its business to insuring the risk of defaults to Residential Mortgage Backed Securities and other Collateralized Debt Obligations, Ambac had billions of dollars of financial liabilities which it could not meet and it lost its AAA credit rating. ¶¶ 7; 173-186 (fundamental shift in business to insuring risky RMBS and CDOs); ¶¶ 195, 200, 203 (billions in losses); ¶ 206 (loses credit rating.) As a result, Ambac was unable to write any new business, its stock price plummeted,[32] the Wisconsin OCI took control over Ambac Assurance,[33] and the Company is now preparing a pre-packaged bankruptcy proceeding.[34] These facts, which Defendants do not contest, amply support that the Company faced imminent collapse during the Class Period.

Attempting to divert the Court's attention from these harsh facts, Defendants fixate on the Plaintiff's Class Period, suggesting that since Ambac was solvent at the start of the Class Period the Court must disregard events alleged to have occurred during and after the Class Period. Def. Br. at 23-27. This notion however, implies that bankruptcies occur in a vacuum and are

---

[31] Just this week, Ambac announced that it is preparing a pre-privileged bankruptcy proceeding. Ambac Form 8-K Press Release, dated November 1, 2010, available at http://www.sec.gov/Archives/edgar/data/874501/000119312510241913/d8k.htm.

[32] ¶¶ 9 (summarizing stock drop of $96.08 to $1.05 per share). Since the Class Period end, Ambac stock has not recovered and currently trades at approximately $0.51 per share. *See* Yahoo Finance, available at *http://finance.yahoo.com/q?s=abk* (last visited on November 5, 2010).

[33] ¶¶ 210 (alleging that Wisconsin OCI began investigating the Company during the Class Period), 221 (alleging Wisconsin OCI took control over Ambac Assurance in March 24, 2010)

[34] ¶ 220 (the Company began disclosing its possible bankruptcy in or around January 2008).

23

independent of decisions being made within a company. To Plaintiff's knowledge, no court has ever limited its consideration to pre-Class Period allegations against a soon-to-be bankruptcy company. Rather, the Court must consider under Rule 8 Plaintiff's pleading in its entirety,[35] which includes factual allegations before, during and after the Class Period that support Plaintiff's prudence claim. Moreover courts routinely consider a company's circumstances, even after the Class Period ends[36], to determine whether the plaintiff's alleged prudence claim is plausible.[37] Therefore, the Court is not confined to one particular day pled in the Complaint.

**6.      The Financial Crisis Does Not Excuse Defendants' Breaches of Fiduciary Duty**

Defendants attempt to avoid liability for Ambac's collapse and the Plan's losses by blaming the general economic crisis experienced by this country in the aftermath of the collapse of the housing market. *See* Def. Br. at 21-22. But that argument is without merit and is premature at this early stage of the case. Rather than being an excuse, the "sub-prime mortgage crisis" (*id.*) was even more of a reason for Defendants to investigate the appropriateness of investing the Plan's assets in Ambac when its business depended primarily upon insuring these industries. *See, e.g., In re General Growth Properties, Inc. ERISA Litig.*, No. 08-cv-6680, 2010

---

[35] "A court must accept as true all of the factual allegations in the plaintiff's complaint …" *International Swaps and Deriv.Ass'n, Inc. v. Socratek, L.L.C.*, 712 F.Supp.2d 96, 101 (S.D.N.Y. 2010) (Baer, J.) (citing *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir.2009)).

[36] *See e.g. In re SLM ERISA Litig.*, 2010WL 3910566 at *9 ( "Indeed, since the end of the Class Period, Sallie Mae's shares have risen nearly fifty percent in value") (citing *McGraw-Hill*, 690 F. Supp. 2d at 270 (factoring rebound of stock price in concluding there was no indication that defendants' viability as a going concern was ever threatened.))

[37]   Defendants' reliance on *In re Computer Sciences Corp.*, 1128, 1135 (C.D. Cal. 2009) a summary judgment decision is misguided. In *Computer Sciences*, the court based its holding on the answer plaintiffs gave in interrogatories, which is not the case here. Similarly, relying on *Keach v. U.S. Trust Co.*, 419 F.3d 626, 637-638 (7th Cir. 2005) another summary judgment opinion, this time decided based on the parties testimony, is inappropriate. Lastly, Plaintiff does not allege that Defendants breached their duty of prudence by one solitary act; rather, Plaintiff alleges Defendants' breach of prudence was a continued course of conduct throughout the Class Period (and beyond). Therefore, *Kirschbaum's dicta* cited by Defendants' here is contrary to Defendants' position. *Id.*, 526 F.3d at 253.

WL 1840245, at *7 (N.D. Ill. May 6, 2010) (rejecting defendants' attempt to blame the financial crisis for their fiduciary failures, firmly stating that "[a]lthough [the] [d]efendants argue that [the company] was a victim of the ripple effect caused by the subprime crisis and real estate market downturn, the [d]efendants also possessed the duty to protect the Plan's retirement assets.")

Arguing, as Defendants do, that the Company's circumstances were a result of economic crisis is simply another attempt by Defendants to abdicate their fiduciary responsibilities. It also neglects that Defendants should have been actively aware of the economic crisis because Ambac's business depended heavily upon borrowers in the real estate market being able to pay back their loans. Defendants analogizing the facts here to those found in recent opinions originating from this district ignores that in none of those cases, excluding *Lehman*,[38] did the companies at issue actually face possible bankruptcy nor were any of these companies unable to generate any new business—which is a definite threat to a company's survival. *See* Def. Br. at 22-23.[39] The *Lehman* decision is inapposite to the facts here because the issue in *Lehman* was not whether the company faced imminent collapse, because it did, but whether the low-level employee who worked in the Company's human resources department and was named as a defendant had sufficient knowledge of any of the sophisticated, high-level information that ultimately led Lehman into bankruptcy. *Id.*, 683 F. Supp. 2d at 302-03. Here, Defendants do not contest that they were high-ranking officers of the Company with access to the relevant facts that threatened the Company's viability. Even a catastrophic, once-in-a-lifetime financial crisis cannot excuse Defendants - - as fiduciaries owing the highest duties to Plan participants - - from taking appropriate action to protect the Plan's participants. *Polaroid*, 362 F. Supp. 2d at 475

---

[38] *In re Lehman Brothers Sec. & ERISA Litig.*, 683 F. Supp. 2d 294, 302-03 (S.D.N.Y. 2010).

[39] *See e.g. Bank of America Corp.*,2010 WL 3448197, *In re SLM Corp. ERISA Litig.*,2010 WL 3910566, *Wyeth*, 2010 WL 1028163, *Gearren*, 690 F. Supp. 2d 254, *Fisher*, 2010 WL 1257345, *In re Citigroup*, 2009 WL 2762708.

(plaintiffs' allegations that defendants failed to take any action or investigate the prudence of continued investment in company stock in plan, even as the stock precipitously declined overtime when they knew of the company's impending collapse stated a claim for breach of fiduciary duties). Defendants' arguments also are misguided because they seek to have the Court resolve on this motion what caused the Company's Stock price to collapse.

## 7.    Plaintiff's Allegations that the Stock was Artificially Inflated State a Prudence Claim

### a.    *Purchasing And Holding Stock at an Artificially Inflated Price is Never Prudent*

Plaintiff alleges that Ambac stock was artificially inflated during the Class Period and that purchasing or holding the stock at these inflated prices was imprudent.[40] ¶¶ 190-199. The DOL has consistently taken the position that investing Plan assets in artificially inflated stock is a *per se* abuse of discretion. *See e.g. DOL Citigroup Amicus*; *DOL Gearren* Amicus. Defendants' contention butts up against the DOL's position. *See* Department of Labor Field Assistance Bulletin 2004-03 (Dec. 17, 2004)[41] ("if a directed trustee has non-public information indicating that a company's public financial statements contain material misrepresentations that significantly inflate the company's earnings, the trustee could not simply follow a direction to purchase that company's stock at an artificially inflated price."). *See also DOL Gearren Amicus* at 18-20. Plaintiff's allegations sufficiently plead that Ambac stock was both overpriced and

---

[40] Defendants do not appear to argue that Plaintiff's allegations that Ambac was artificially inflated is subject to the *Moench* presumption, (Def. Br. at 27), which is consistent with the DOL. *See DOL Citigroup Amicus Brief* at 17. ("…there is no rationale for applying the *Moench* presumption where, as here, the fiduciaries allegedly knew or should have known that the stock was artificially overpriced. It is always imprudent for ERISA fiduciaries to knowingly overpay for stock and they are not entitled to any contrary presumption."). Contrary to Defendants' contention, Plaintiff's claim does not depend on his allegations that the stock was artificially inflated. *See supra* Section II.E(1)(2). Nonetheless, his artificial inflation allegations state a claim.

[41] Courts give deference the DOL's field assistance bulletins. *In re Halpin*, 566 F.3d 286, 290 (2d Cir. 2009) (applying *Sidmore v. Swift & Co.*, 323 U.S. 134 (1944) deference to Field Assistance Bulletins.)

excessively risky during the Class Period – and it is never prudent to over pay for a plan asset.  If

Plaintiff's allegations are true, then "the defendants acted imprudently." *See Id.* at 18 (citing

*Dovavan* 754 F.2d at 1054-155 (). For now, it is sufficient that Plaintiff's allegations are

plausible.[42] *See e.g. Shanehcian* 2009 WL 25224562, at *7; *Urban v. Comcast Corp.*, No. 08-

CV-773, 2008 WL 4739519, at *13 (E.D.Pa. Oct. 28, 2008).

      b.     <u>Defendants Cannot Avoid Liability by Invoking The Securities Laws</u>

Courts have repeatedly rejected attempts by defendants in similar ERISA cases to excuse

their breaches by using the federal securities laws as a shield. *See e.g.*, *In re WorldCom, Inc.*,

263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003) (in rejecting the argument that a tension exists

between the federal securities laws and ERISA, the court noted that "What is required, is that any

information that is conveyed to participants be conveyed in compliance with the standard of care

that applies to ERISA fiduciaries."); *see also In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d

206, 214 (D. Conn. 2007).   As the Northern District of Illinois has suggested, adopting

Defendants' reasoning "would essentially permit a fiduciary to violate his or her ERISA duties

under the guise of complying with another statue [sic] when other options exist.  For example, if

disclosing information to plan participants would violate a statutory ban on selective disclosure,

the fiduciary could inform both plan participants and the general public." *Brieger v. Tellabs,

Inc.*, No. 06-CV-1882, 2009 WL 1565203 (N.D. Ill. June 1, 2009)(citing *In re Ferro Corp.

ERISA Litig.*, 422 F. Supp. 2d 850, 862-63 (N.D. Ohio 2006)).   Defendants cannot use the

securities laws to shield themselves from liability for their fiduciary breaches.

The fact that a fiduciary's disclosures may cause losses to a retirement plan ignores the

---

[42] Notably, in the parallel securities case, which has a more heightened pleading requirement, Judge Buchwald held that the pleadings sufficiently alleged certain claims related to misstatements made by some of the Defendants here. *See In re Ambac Financial Group, Inc. Securities Litig.*, 693 F. Supp. 2d 241.

infinite number of possible outcomes based on gradual disclosures to the market.   *See, e.g., In re Honeywell Int'l ERISA Litig.*, No. 03-CV-1214, 2004 WL 3245931, at *12 (D.N.J. Sept. 14, 2004) ("Disclosure might not have prevented the Plan from taking a loss on Honeywell stock … but it would have prevented the Plan from acquiring … additional shares of overpriced Honeywell stock: the longer the fraud continued, the more of the Plan's good money went into a bad investment . . .").

Courts have also rejected Defendants' argument which rests on the so-called "efficient market hypothesis" – a hypothesis that suggests that any disclosure of improperly withheld information to the larger market would have caused an immediate correction to the stock price, leading to an unavoidable loss to the Plan and its participants, thus precluding any claim to damages.  Def. Br. at 28-29.  As one court noted, if this argument were to apply, "it is hard to imagine that any ERISA claim for breach of fiduciary duty predicated upon a drop in stock price after disclosure of corporate weaknesses could survive a motion to dismiss where an EIAP is involved."  *Urban v. Comcast Corp.*, No. 08-CV-773, 2008 WL 4739519, at *13 (E.D.Pa. Oct. 28, 2008).  In *Urban*, the Court refused the defendants' attempt to foreclose a claim for breach of the duty of prudence where plaintiff alleged that defendants "failed to act where they knew or should have known material information not available to plan participants or the market at large."  *Id.*; *See also, KeyCorp 678 F. Supp 2d* at 16 (holding "[a]s Judge Manos noted in *Ferro* [422 F. Supp. 2d at 863] the efficient market defense is inappropriate at the motion to dismiss stage because 'whether [Plaintiff's alleged] losses would have been more or less significant [upon disclosure of the undisclosed information] is a speculative issue inappropriate for resolution at this early stage of the litigation.'").

In *Bunch,* the Court rejected the efficient market hypothesis and stated that "reiterating

what was decided by the district court, this position is plainly wrong." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1 (1st Cir. 2009). "[A]s cogently stated by [the district] court, the efficient market is not the standard by which State Street's actions are to be judged. Rather, under ERISA, a fiduciary is required to act with the care, skill, prudence and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use." *Id.*

## B.   COUNT I PROPERLY ALLEGES A CLAIM FOR DEFENDANTS' BREACH OF LOYALTY TO THE PLAN

Plaintiff alleges that Defendants breached their duty of loyalty to the Plan and its participants by offering Ambac Stock as a retirement investment when it was imprudent to do so and by failing to inform Plan participants about the true risks to their retirement assets, including the risks that the Company faced significant exposures to losses before and during the Class Period that jeopardized its financial viability. ¶¶ 185-191. Plaintiff alleges that Defendants concealed, distorted and misrepresented this information which precluded Plan participants from being able to properly evaluate the prudence of investing in the Company's stock.[43] ¶¶ 231, 233, 271. Plaintiff further alleges that Defendants knew (based on their high ranking positions at the Company)[44], or should have known based on their duty to investigate (as Plan fiduciaries)[45] that the Company faced impending collapse, which they failed to disclose to Plan Participants who followed their natural biases of investing in their employer's stock. ¶¶ 192-194.

---

[43] Defendants no doubt will argue that the generalized disclosures of risk made in the SPD satisfy their obligations under ERISA. However, disclosing that investing in a fund that primarily invests in a single equity risky is not the same as disclosing that that equity is no longer a prudent investment because that company will likely be bankrupt soon. Failing to disclose the latter violates ERISA. *See Globe Woolen Co. v. Utica Gas & Elec. Co.*, 224 N.Y. 483, 489 (N.Y. 1918) (Cardozo, J.) ("A beneficiary, about to plunge into a ruinous course of action, may be betrayed by silence as well as the spoken word.") *See also Bixler v. Cent. Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) (recognizing affirmative disclosure duty where plan fiduciary "knows that silence would be harmful"); *Polaroid*, 362 F. Supp. 2d at 478.

[44] *See* ¶ 221.

[45] *See* ¶¶ 226, 227.

Under Rule 8's standards, these allegations sufficiently state a claim that Defendants breached their duties of loyalty to Plan participants. *Morgan Stanley*, 696 F. Supp.2d at 365 (S.D.N.Y. 2009). *See also Polaroid*, 362 F. Supp. 2d at 478 (holding that plaintiffs stated a claim when defendants failed to inform plan participants of material adverse developments of investing in company stock when defendant's knew that the company's prospects of continuing as a going concern were threatened).

Defendants correctly point out that the Supreme Court has held that "lying is inconsistent with the duty of loyalty owed by all fiduciaries." Def. Br. at 30 (quoting *Varity v. Howe*, 516 U.S. 489, 398, 506 (1996)). When a fiduciary fails to speak up and correct information that he or she knows would mislead plan participants, this is the same as lying. This Court has expressly recognized that ERISA imposes upon fiduciaries an affirmative duty to disclose material information to plan participants regarding the prudence of investing in company stock – *see In re Pfizer Inc. ERISA Litig.*, No. 04-CV-10071, 2009 WL 749545 (S.D.N.Y. Mar. 20, 2009) – and flatly rejected the same arguments advanced by Defendants here. *Polaroid*, 362 F. Supp. 2d at 478. *See also Braden v. Wal-Mart Stores, Inc.*, No. 08-CV-3798, 2009 WL 4062105, at *9 (8th Cir. Nov. 25, 2009) ("ERISA and its associated regulations impose upon fiduciaries extensive and specific obligations of disclosure."); *Dobson v. Hartford Fin. Servs. Group*, 389 F.3d 386, 401-02 (2d Cir. 2004) ("[a] number of authorities assert a plan fiduciary's obligation to disclose information that is material to beneficiaries' rights under a plan, even if such information goes beyond the four corners of the plan itself.") (citations omitted).

## C.   PLAINTIFF HAS ADEQUATELY PLED THE FIDUCIARY STATUS OF ALL DEFENDANTS

"The determination of a defendant's fiduciary status is a fact-intensive one" and is thus an issue not properly decided on a motion to dismiss. *Patten v. Northern Trust Co.*, 703 F. Supp. 2d

799, 807 (N.D.Ill, 2010). In order to survive a motion to dismiss, "an ERISA complaint 'need to little more than track the statutory definition' to establish defendant's fiduciary status in compliance with Rule 8." *Polaroid*, 382 F. Supp. 2d at 470. Under ERISA, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . .or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002 (21)(A).

Plaintiff has alleged in detail the discretionary authority granted to each Defendant under the Plan (*supra*, Section II.B) and that by virtue of that authority Defendants were functional or *de facto* fiduciaries of the Plan. ¶¶ 44, 51, 56,69, 74, 87, 93, 97, 106, 108, 156, 160.

The Investment Committee individual Defendants[46] rightly concede that they are Plan fiduciaries. The remaining Defendants' effort to hide behind the Plan language however is both puzzling and meritless. First, Defendants' attempt to limit the designated responsibilities of the select Committees lacks any citations to the Plan itself. Def. Br. at 32. This is no doubt because any actual review of the Plan reveals the extent of authority granted to the Administrative Committee, including the authority to interpret and amend the Plan if necessary (Plan Terms, §§ 11.5, 13.1(c)) and the endowment of "final authority with respect to operation and administration of the Plan." Plan Terms, § 11.5(a); *supra*, Section II.B.2.[47] Moreover, the Plan specifically designates the Administrative Committee as a named fiduciary. Plan Terms, § 11.11. Finally, ERISA clearly establishes that the role of a fiduciary is a functional one, not necessarily a

---

[46] Investment Committee members included Defendants Gandolfo, McKinnon, Leonard, and Renfield-Miller as well as Bryanne Graser, Richard Alger, Kathleen Hacket, Debra Saunders and Maria Spinelli.

[47] Any ambiguity in the Plan Terms must be resolved in the Plaintiff's favor at the motion to dismiss stage. *See In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.,* Lead No. C07-1874 MJP, 2009 WL 3246994, at *6 (W.D. Wash. Oct. 5, 2009).

Case 1:10-cv-04191-HB   Document 45   Filed 11/05/10   Page 40 of 44


prescriptive one – hence the phrase "*de facto* fiduciary." *See Northern Trust*, 703 F. Supp. 2d at 807 (holding that "Plan documents do not conclusively control the determination of who is a fiduciary"). Without the benefit of discovery, this Court must rule on the motion to dismiss based upon the well-pled allegations of the Complaint, which clearly establish that the Administrative and Compensation Committees and their members had duties and authority with respect to the Plan and its management that rendered them functional fiduciaries of the Plan liable for Plaintiff's claims in Count I.

## D.   PLAINTIFF HAS ADEQUATELY PLED A FAILURE TO MONITOR CLAIM AGAINST THE COMPENSATION COMMITTEE

The duty to monitor is firmly established under ERISA and is comprised of two facets. First, the duty to monitor demands that fiduciaries monitor the performance of other appointed fiduciaries charged with making decisions regarding the plan. *See, e.g.*, *In re Washington Mutual, Inc. Sec., Derivative, & ERISA Litig.*,  2009 WL 3246994. at *2 (noting "courts have permitted plaintiffs to proceed where they advance monitoring claims based on the duty to inform appointees."); *see also Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998) ("The power to appoint and remove trustees carries with it the concomitant duty to monitor those trustees' performance"); *Polaroid*, 362 F. Supp. 2d at 477 ("An appointing fiduciary's duty to monitor his appointees is well-established.") (citations omitted).

The duty to monitor also includes the obligation to provide to appointed fiduciaries all material information that is necessary for them to carry out their fiduciary duties. *Id.* at 477 ("The Complaint alleges that [monitoring defendants] failed to take any steps to monitor the other [d]efendants. Thus, [p]laintiffs' allegation that [monitoring defendants] failed to adequately monitor or keep the [p]lan [a]dministrators and [f]und [m]anagers informed states a claim for breach of fiduciary duty") (internal citations omitted); *see also Worldcom*, 263 F. Supp. 2d at

32

766-67. The DOL has explained that the duty to monitor includes a duty to ensure that appointees have accurate information. *See* DOL *Citigroup* Amicus at 25.

Plaintiff has sufficiently pled allegations that satisfy either facet of a breach of monitoring duty claim against the Compensation Committee. Plaintiff has alleged that the Compensation Committee was expressly charged with appointing members to the remaining committees and monitoring their performance (¶ 161) and that the Compensation Committee breached its fiduciary duty by (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank-and-file employees in Ambac Stock, an investment that was imprudent and subject to inevitable and significant depreciation. ¶ 281. *See In re Morgan Stanley ERISA Litig.*, 696 F. Supp.2d 345, 366-67 (S.D.N.Y. 2009) (upholding similarly well-pled allegations); *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944, 963 (W.D. Tenn. 2010) (same).

Defendants also argue that "liability cannot be imposed where the appointing fiduciaries lacked notice of 'possible misadventure by their appointees.'" Def. Br. at 34 (citing *Newton v. Van Otterloo,* 756 F.Supp. 1121, 1132 (N.D. Ind. 1992). That Defendants were woefully ignorant of the ongoing drop in stock value throughout the Class Period and the crippling level of defaulting assets on the Company's balance sheet is a factual matter not appropriately determined on a motion to dismiss. Allegations that the monitoring defendants did nothing while the stock declined, as those made against the Compensation Committee, "suggest[] that no system was in place to review and evaluate the performance of their appointees or that potential breaches were otherwise going unaddressed" and thus are sufficient to state a claim for breach of

33

the duty to monitor. *Morgan Stanley,* 696 F. Supp. 2d at 366.[48]

### E.    PLAN COMMITTEES ARE PROPER DEFENDANTS UNDER ERISA

Although Defendants seek to dismiss the claims against the Plan Committees (Def. Br. 35), their argument contradicts Federal Rule of Civil Procedure 17(b)(3)(A) which states that "a partnership or other unincorporated association . . . may sue or be sued" to enforce a right under U.S. law, including ERISA.[49]   Courts considering ERISA claims against committees routinely permit those claims to proceed against the committees. *See*, *generally Morgan Stanley*, 696 F. Supp. 2d 345; *Polaroid*, 362 F. Supp. 2d 461; *Noa v. Keyser*, 519 F. Supp. 2d 481 (D.N.J. 2007); *Enron*, 284 F. Supp. 2d at 617 (finding such arguments "frivolous" and rejecting because "ERISA, which provides the substantive law here, expressly contemplates that when an administrative committee acts . . . as a fiduciary in breach of its fiduciary duties, it may be sued").   This makes sense because otherwise a plan could frustrate ERISA's purpose and immunize itself from liability simply by designating the committee as the fiduciary – like the Plan in this case – leaving plan participants with no recourse for breaches of fiduciary duty. Accordingly, the Investing, Administrative and Compensation Committees are properly named as defendants.

### V.    CONCLUSION

Plaintiff sufficiently alleges Defendants' breaches of their ERISA-mandated fiduciary

---

[48] Defendants also suggest that the Complaint "tasks the Compensation Committee with a fiduciary role not assigned by the Plan" (Def. Br. at 34) but Defendants fail to specify what role that is or what paragraph of the Complaint they are addressing. Regardless, any allegations regarding the Compensation Committee's duties and authority are directly quoted from the Plan, as is evident by the citations in the Complaint which can be easily confirmed. This argument is disingenuous and completely without merit.

[49] As Defendants concede, ERISA also defines person to include "association[s] or employee organizations."

duties.  Accordingly, the Court should deny Defendants' Motion in its entirety.[50]

Dated:  November 5, 2010                    SQUITIERI & FEARON, LLP


                                            By:/s/  Stephen J. Fearon, Jr.
                                                    Stephen J. Fearon, Jr.
                                                    Caitlin Duffy
                                                    Garry T. Stevens, Jr.
                                            32 East 57th Street, 12th Floor
                                            New York, New York 10022
                                            Tel: 212-421-6492
                                            Fax: 212-421-6553
                                            stephen@sfclasslaw.com
                                            caitlin@sfclasslaw.com
                                            garry@sfclasslaw.com

                                            *Attorneys for Plaintiff*

---

[50] To the extent the Court finds that any of Plaintiff's allegations are insufficient, they respectfully request the opportunity to amend their Complaint. *See* Fed. R. Civ. P. 15(a); *Foman* v. *Davis,* 371 U.S. 178, 182 (1962).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KARTHIKEYAN V. VEERA,

                Plaintiff,

   v.

AMBAC PLAN ADMINISTRATIVE
COMMITTEE, et al.,

                Defendants.

Case No: 1:10-CV-4191 (HB)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff's Memorandum Of Law

Opposing Defendants' Motion To Dismiss The Amended Complaint and Declaration of Stephen

J. Fearon, Jr. In Support Of Plaintiff's Opposition To Defendants' Motion To Dismiss The

Amended Complaint has been filed and served by Notice of Electronic Filing pursuant to Rule

5(b) (2) (E), Federal Rules of Civil Procedure on this 5th day of November, 2010.

Gregory C. Braden
Christopher A. Weals
1111 Pennsylvania Avenue NW
Washington, DC 20004

Jamie M. Kohen
101 Park Avenue
New York, New York 10178
Attorneys for Defendants

/s/     Stephen J. Fearon, Jr.
Stephen J. Fearon, Jr.